# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### MARCH SESSION, 1999



**FILED**

December 21, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | |
|---|---|
| **STATE OF TENNESSEE,** | )C.C.A. NO. W1997-00097-CCA-R8-CD |
| Appellee, | ) |
| | ) **SHELBY COUNTY** |
| **V.** | ) |
| | ) **HON. JOSEPH B. DAILEY, JUDGE** |
| **TONY V. CARRUTHERS and JAMES MONTGOMERY,** | ) |
| | ) **CAPITAL CASE** (Premeditated First Degree Murder, Three Counts; Especially Aggravated Kidnapping; Three Counts; Especially Aggravated Robbery, One Count |
| Appellants. | ) |

FOR THE APPELLANTS:

**STEPHEN R. LEFFLER**
Counsel for Carruthers On Appeal
50 North Front Street, Suite 999
Memphis, TN 38103

**LEE A. FILDERMAN**
Counsel for Carruthers On Appeal
44 North Front Street, Suite 701
Memphis, TN 38103

**TONY V. CARRUTHERS,** *pro se* at trial

**ROBERT C. BROOKS**
Counsel for Montgomery On Appeal
707 Adams Avenue
Memphis, TN 38105

**EDWARD W. CHANDLER**
Counsel for Montgomery On Appeal
2502 Mt. Moriah, Suite A-100
Memphis, TN 38115

**HAROLD D. ARCHIBALD**
Counsel for Montgomery At Trial
22 North Front Street, Suite 900
Memphis, TN 38103

**J.C. McLIN**
Counsel for Montgomery At Trial
301 Washington Avenue, Suite 210
Memphis, TN 38103

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**AMY L. TARKINGTON**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243

**JOHN W. PIEROTTI**
District Attorney General

**PHILLIP GERALD HARRIS**
Assistant District Attorney General

**J. ROBERT CARTER, JR.**
Assistant District Attorney General
Criminal Justice Center, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED _____
AFFIRMED
THOMAS T. WOODALL, JUDGE

# OPINION

The appellants, James Montgomery and Tony Carruthers, were each indicted, along with their co-defendant, Jonathan Montgomery, on three counts of the premeditated first degree murders of Marcellos Anderson, his mother, Delois Anderson, and Frederick Tucker. Prior to trial, Jonathan Montgomery was found hanged in his jail cell. James Montgomery and Tony Carruthers were also indicted on three counts each of the especially aggravated kidnapping of all three victims, and one count each of the especially aggravated robbery of Marcellos Anderson. The appellants were tried and convicted on each charge. The appellants were sentenced to death by electrocution for the three murder convictions and received forty year sentences for each of the other offenses. The jury found the existence of four aggravating circumstances as to each appellant for each murder conviction: 1) the murder was especially heinous, atrocious or cruel in that it involved torture; 2) the appellants committed mass murder; 3) the appellants had previously been convicted of one or more violent felonies; and 4) the murders were committed during the perpetration of especially aggravated kidnapping and especially aggravated robbery. T.C.A. § 39-13-204(i)(2), (5), (7), and (12). On appeal, the appellants raise the following issues concerning alleged errors occurring before trial as well as during both phases of the trial:

### Appellant Carruthers

Whether appellant was denied his right to due process by having to represent himself;

Whether appellant was denied the effective assistance of counsel;

Whether the state should have been required to elect on which indictment it was proceeding;

Whether the grand jury proceedings were proper;

Whether the trial court erroneously admitted hearsay and irrelevant evidence;

Whether the trial court should have ordered a competency evaluation of a prosecution witness;

Whether the court erroneously admitted videotape and photographic evidence;

2

Whether appellant was denied his right to be present at sentencing for the especially aggravated kidnapping convictions;

Whether the prosecutor engaged in improper argument;

Whether the trial court erred in issuing a gag order;

Whether the death penalty statute is unconstitutional; and

Whether the evidence was sufficient to support the verdicts.

### Appellant Montgomery

Whether the trial court erred in denying appellant's motion for severance;

Whether the trial court erroneously admitted hearsay evidence;

Whether the prosecutor engaged in improper argument;

Whether prior consistent statements were improperly introduced into evidence;

Whether the trial court erred in admitting photographic evidence;

Whether the trial court erred in admitting photographs of the victims taken while they were alive;

Whether the trial court erroneously excluded evidence of alternative perpetrators;

Whether the trial court improperly admitted opinion testimony;

Whether the trial court properly instructed the jury;

Whether the evidence was sufficient to sustain the verdicts;

Whether the death penalty statute is unconstitutional.

Having thoroughly reviewed the 82 volume record in light of the issues raised by both appellants in their separate briefs, and finding no errors requiring reversal of either the convictions or sentences, we affirm the judgment of the trial court.

### HISTORY

In order to put the procedural history of this case in proper perspective for the issues raised, we will first outline the events leading up to trial and will then discuss the evidence introduced at trial. The appellants were indicted for first degree murder in March 1994. The Office of the Public Defender was appointed to represent Montgomery. Carruthers initially retained an attorney, A.C. Wharton, who was subsequently allowed to withdraw because of a potential conflict of interest. Nothing

in the record suggests this conflict was created by the conduct of Carruthers. At a hearing on April 27, 1994, the trial court mentioned that Carruthers informed the court he wanted some input as to which attorney would be appointed to his case. In a subsequent hearing on May 18, 1994, Carruthers indicated that his family's attempt to retain counsel failed. He asked the court to appoint counsel so he could start filing motions.

Carruthers, who eventually represented himself at trial, was appointed a number of attorneys throughout the two years leading up to the trial in this case. Although we go into more detail below, for the sake of reference we will list in order all the attorneys who were appointed and allowed to withdraw: Larry Nance (appointed May 1994 - withdrawn December 1994); Craig Morton (appointed August 1994 - withdrawn July 1995 ); Coleman Garrett (appointed December 1994 - withdrawn July 1995); William Massey (appointed July 1995 - withdrawn January 1996); Harry Sayle (appointed July 1995 - withdrawn February 1996). The trial court also appointed at different times two attorneys, James Turner and Glenn Wright, to assist in the investigation of the case, but both were subsequently allowed to withdraw as well.

On May 31, 1994, after Carruthers informed the court that he had no success in hiring another lawyer, the trial court appointed Larry Nance. On July 8, 1994, the state filed its notice to seek the death penalty against both appellants for each murder charge. In a hearing on July 15, 1994, the trial court scheduled a hearing on pretrial motions for September 30, 1994, and set the trial date for February 20, 1995. Carruthers was present at the hearing and asked the trial court "why this is being dragged out like this. I asked Mr. Nance if we can go forward with a motion of discovery and he's asking for a reset. And I'd like to know why." Nance informed the court that he was going to visit the prosecutor's office later in the week to review their evidence. The trial court stated:

> Court: This is a complex case. We have several lawyers who have a
> lot of work to do on this case and a lot of work to do on other cases that
> they're handling --

4

Carruthers: Yeah, Your Honor, but --

Court: Wait a minute. Wait a minute.

And we've got a trial date now as early as possible. A three-defendant capital murder case requires at least a week, probably two, to try and so we can't set it this fall because this fall is already full.

We've already got cases set for trial every week between now and January. And Mr. Stein [counsel for Montgomery] has cases set throughout January. So the earliest possible date, the earliest possible date, that we can try a three-defendant capital murder case is in February. That's the best we can do.

We've got a lot of other cases. There are a lot of other people sitting back there waiting for their trials that have been waiting longer than you have.

And so given the fact that the trial isn't until February, we're setting the next Court date in September for the arguing of motions. Between now and September, your attorney and the attorneys representing your two co-defendants can get with the prosecutors and can obtain their discovery.

They're all excellent attorneys. And they'll all do that. And once they've obtained the discovery, they'll meet with their clients and they'll file appropriate motions, which will be heard on September 30th, which will still be well in advance of the trial date, which will give everyone ample time to then evaluate the case, after the motions have been heard and ruled on.

So given the fact that we can't get a three-defendant capital case that's still in the arraignment stage to trial any earlier than February, there's plenty of time for your attorneys to meet with the prosecutors, get the discovery, meet with the clients, file motions, argue motions.

Just because he hadn't done it yesterday, because you want him to have it done yesterday, doesn't mean that he's not working on your case diligently and properly. He'll have everything done well in advance of the next Court date.

And so, you know, he may not do it the very moment you want it done, but you're going to have to work with him on that because there's ample time for him to get it done.

Carruthers: I talked to him over forty-five days ago [approximately the time Nance was appointed] and asked him to talk to the medical examiner about getting the time of death and autopsy. He hadn't did that yet.

Court: Well, that's fine.

Carruthers: And that's forty-five days.

Court: That's fine. Step out.

The record reflects that Nance filed numerous pretrial motions, including requests for discovery, investigative services and a mental examination. On August 12, 1994, Craig Morton was appointed as co-counsel for Carruthers. The record reflects that Morton started filing a litany of motions after his appointment. These included motions in limine to exclude certain evidence, e.g., letters Carruthers mailed to Jimmy Maze, a motion for individual voir dire, motions for various discovery requests, a motion for impeachment evidence, a motion for competency evaluation of prosecution witnesses, motion for another mental evaluation of

5

Carruthers, motions to dismiss the indictments, motion to suppress statement of co-defendant Jonathan Montgomery, motions for severance, a motion for expert services, and a notice of an alibi defense.

In a hearing on September 30, 1994, the trial court continued the motion hearing date until November 18, 1994. The court stated that it would consider any motion filed by either appellant to apply to both, if applicable. The trial judge also mentioned that he had received "an abundance of correspondence" from both appellants expressing concern about the pretrial performance of counsel. The court allowed counsel to make statements on the record in response to these letters. Initially, Nance stated that the defense had almost obtained complete discovery from the state. He further stated that he could not say how many of the 100 state witnesses (which included everyone remotely related to this case including all of the police officers and state employees) he had interviewed, but that he had already issued subpoenas for about eight of those witnesses. Nance indicated that he had met with Carruthers two separate occasions for an extended period of time to discuss his case. He had also met Carruthers' family to discuss matters. Nance admitted there was quite a bit more work yet to be done, such as obtaining the services of an investigator, and stated that he had spent approximately 25 hours working on the case up to that time, including discussions with co-counsel about defense strategy. Nance also informed the court that there was "some enmity that's developed between he and I," but that counsel had hoped it could be worked out.

The court also allowed Carruthers to tell his side of the story. Carruthers disputed counsel's recollection of the visits and informed the court that he had filed a complaint with the Board of Professional Responsibility against Nance. He also stated that counsel has shown no "eagerness" in this case and that he did not "fear" counsel. Carruthers' main complaint seemed to be a lack of face-to-face communications. The court acknowledged the appellants' concerns given what they faced, but told them that many aspects of the attorney-client relationship did not involve personal contact. The court stated that the representation up to that point as he saw it was well within the proper standards: the appropriate motions had been

filed, discovery had been sought, and conferences had been held. The fact that the appellants may not like their attorneys, according to the trial court, had no bearing on counsel's performance.

On October 21, 1994, the trial court authorized payment for investigative services (Arthur R. Anderson) for Carruthers. Morton informed the court, however, that the investigator tried to talk to Carruthers on two separate occasions at the jail but was told Carruthers refused to see him. Also at the hearing on the 21st, the prosecutor informed the court that he had provided all the discovery he had at that point; he was still waiting on a ballistic report. In addition, the court authorized competency evaluations for each appellant. In a hearing before the trial court on November 18, 1994, Morton requested permission to hire a new investigator because he felt the one they had, Arthur Anderson, was not taking an aggressive enough role in the matter. The court continued the hearing date on pretrial motions until December 16, 1994. Morton informed the court in another hearing on November 23, 1994, that they had secured the services of Premier Investigations.

Throughout Nance and Morton's representation, Carruthers filed various pro se motions on his own behalf. Along with a motion for substitution of counsel, Carruthers filed motions similar to those filed by counsel, as well as those filed by his co-defendant, James Montgomery. In fact, many of these pro se filings are identical to those filed by Montgomery pro se. On December 9, 1994, Larry Nance was allowed to withdraw as counsel. The record does not contain a copy of the motion or transcript of a hearing, if there was one. Coleman Garrett was appointed as co-counsel that same day. Thereafter, counsel continued to file motions, including motions to continue the trial date. Carruthers also continued filing pro se pleadings. Similarly, Morton filed several motions prepared by Carruthers, apparently at Carruthers' insistence. On December 16, 1994, the court heard most of the motions filed by counsel, and continued hearing on those involving an evidentiary hearing until January 30, 1995. It should be noted that since the beginning of this case, Montgomery also voiced numerous complaints about his counsel. In fact, counsel was allowed to withdraw from Montgomery's

7

representation as well. There is nothing in the record, however, to suggest that Montgomery's conduct was as egregious as Carruthers'.

Garrett and Morton appeared at the motion hearing on January 30, 1995, and presented argument on over seventeen motions, including joining the motions filed by the codefendant. These motions addressed suppression and discovery issues, re-evaluation of Carruthers, competency of state witnesses, severance, expert services, and courtroom security. Also at the hearing, the trial court continued the trial date until September 5, 1995.

On May 1, 1995, Garrett and Morton informed the court they had been having difficulty finding a willing investigator because of the nature of the case and the pay (the court adopted a payment scheme whereby the investigator would be paid $1,000 and must file an accounting of services and the court would then decide later if additional funding was appropriate; the court set the hourly rate the same as for the attorneys, but apparently the investigators were demanding more). Garrett secured an investigator to appear at the hearing, but when the court announced the amount of compensation granted for her services, she informed counsel she was unable to take the case. The court decided that since counsel was having trouble finding an investigator, the court would appoint a third attorney (James Turner), to be paid at the same rate as counsel, to serve as appellant's investigator. Carruthers objected to this alternative, stating that attorneys cannot obtain the same information as a certified investigator. The court stated that Carruthers' objection was not well founded. Counsel also addressed several pretrial motions, including a motion to dismiss indictments (Alfredo Shaw testified before the grand jury, but the state informed the court that it was not going to use Alfredo Shaw's statements at trial because the state had since considered him to be unreliable), a motion to sever, and a motion for expert services to analyze an audio tape of Nakeita Montgomery's statement.

On May 5, 1995, Attorney James Turner appeared before the court and stated, due to the number of witnesses Carruthers named and the amount of work

involved in the case, he did not believe, as a solo practitioner, that he could effectively perform investigation to assist counsel. The court stated that it would continue to locate an attorney/investigator. Attorney Glenn Wright was subsequently appointed to assist Morton and Garrett in investigating the case. On June 2, 1995, Garrett argued the appellant's motion to dismiss indictments due to Shaw's allegedly false testimony before the grand jury.

Morton and Garrett eventually filed a motion to withdraw. The record reflects that Carruthers also filed a motion for substitution of counsel. The trial court granted both requests and in a hearing on July 27, 1995, the court appointed William Massey and Harry Sayle to represent Carruthers. During this hearing, the trial judge made the following comments:

> All right. I understand that these three defendants are on trial for their lives and that these are the most serious of charges and that they are all concerned that they are well represented and properly represented, and it's everyone's desire to see to it that they are well represented and properly represented. And toward that end, efforts are being made that they are represented by attorneys that have enough experience to handle this type of case and by attorneys that can establish a rapport with their clients that would allow them to represent their clients as well.
> We have gone through several attorneys now in an effort to accommodate the defendants' requests in that regard; but at some point -- and in my opinion, each of the attorneys and each of the investigators that has represented these defendants that has been relieved have been eminently qualified to do the job, but I have allowed them to be relieved for one reason or another.
> I want the record to be perfectly clear at this point because of some suggestions that have already been raised by some of the correspondence that I have received from Mr. Carruthers; and all of it, by the way, will be made a part of the record. But Mr. Carruthers has suggested, in his correspondence, that some of the previous attorneys have been relieved because they weren't capable or competent to do the job. And this is, in my opinion, at least -- my humble opinion as the judge in this case -- absolutely and totally an inaccurate statement. The attorneys that have been relieved thus far have been fully capable and fully competent and had been doing an outstanding job; but for a variety of reasons, I've allowed them to withdraw from the case.
> Obviously Mr. Carruthers can say anything he wants. It's a free country. He can write letters to the Commercial Appeal or the President of the United States and say whatever it is he wants to say. But the point is that I want the record to reflect, each step of the way, so that if he is convicted, and if so if he raises these sorts of questions three years or five years or ten years down the road, the record is perfectly clear that these attorneys were not relieved because they were not doing an adequate job. They were not relieved because Mr. Carruthers was not well represented and left in an untenable position because he had ineffective assistance of counsel pretrial. That is absolutely not the case in my opinion.

Mr. Carruthers has raised, through his correspondence, and apparently through direct communication with his previous attorneys, certain matters that are pretty outrageous suggestions; but because of the nature of the matters that he's raised, the attorneys that represented him previously felt that an irreparable breach had occurred between their ability -- between Mr. Carruthers and themselves -- effecting their ability to continue to represent them. And at some point -- and that could well have been the point, but it wasn't. But at some point these matters that are raised by the defendants cannot continue to be used to get new counsel because it gets to be a point where they're -- it's already well beyond the point, but, obviously, at some point, gets to the point where they're manipulating the system and getting what they want -- Mr. Carruthers, sit still, please, or you can sit back there. -- gets to the point where they're manipulating the system and getting trial dates and representation that they want and are calling the shots. That's another matter that's been raised by Mr. Carruthers in some of his correspondence; that he wants his attorneys to know that he's the man calling the shots in this case, and he's the man to look to.

Well, of course, again, it's a free country, and he can say whatever he wants, and he can think whatever he wants; but as far as I'm concerned -- and this applies to all three defendants and any defendants that come through this court that are represented by counsel -- and this gets back to what Mr. McLin alluded to earlier -- the attorneys are calling the shots in this case. They are trying the case except for certain areas where the defendant has the exclusive and final say, such as whether he wants to testify or not and that sort of thing. The attorneys are in here representing these clients and will do so to the best of their ability. They are the ones who have been to law school. They are the ones that have been through trial many times before, and they're the ones that are here for a reason, and that reason is to represent these individuals. And, so, you know, if there's a conflict between the attorney and client with regard to how to proceed in the case, you all resolve it as best you can, but ultimately the attorney is trying the case. And, you know, we don't pull people off the sidewalk to try these cases; and the reason we don't is because of certain things that they need to learn and certain experiences they need to have professionally before they're prepared to try these cases. So they're here for that reason and for that purpose. . . .

. . .

So that gets me to the reason for our being here. Because of the matters raised by Mr. Carruthers, I have granted the request of his previous two attorneys and investigator reluctantly because, in my opinion, they were doing an outstanding job of representing Mr. Carruthers and his interests.

Mr. Carruthers, if you want to laugh through this proceeding, then, again, I'm going to allow you to sit back in the back. If you can sit here and listen to what goes on and communicate with your new attorney, that's fine. You have every right to do that. But if you continue tossing your pen in the air and laughing every fifteen seconds, then it's fine if you sit back in the back, and your attorney can communicate with you back there. So it's up to you. I mean it doesn't make any difference to me. We can have this hearing with you, or we can have it without you. And it's completely your decision, but if you continue to act in that way, I don't plan to conduct this business with you back there laughing and that sort of thing. You can put your hand down, and you can talk to your attorney, and he can address me if he thinks it's appropriate. If he thinks it's inappropriate, then he doesn't have to, and you'll have an opportunity to address him and talk to your attorney in just a minute -- as soon as I'm through making these statements for the record.

And, so, again, if -- you know, if you continue with this, and this is going to be true for every hearing that we have -- pretrial and during the trial itself -- if you all want to -- if you want to act that way -- if you want to make faces, toss pens in the air, waive your hand, laugh, that's

fine. You can sit back there and do that, and that's fine. If you want to sit and listen intently because this is a serious matter to everybody concerned, that's fine. It's your choice. It doesn't make any difference to me. But you make the decision, and I'll -- and if you persist in acting this way, you can sit back there, and your attorney can convey to you what's going on in court. If you want to sit and act responsibly out here, you can do so, and you can participate in the trial. Now, where were we?

Because of the most recent rash of allegations raised by Mr. Carruthers in his many letters that he's sent me -- I assume he's sent copies of the letters to his counsel and to others; but I've certainly got them, and they will be made a part of the record. And because of the types of things he alleged in those letters and the position that it put his previous attorneys in, and their very, very strong feelings about not continuing to represent Mr. Carruthers under those circumstances, I have reluctantly agreed to let them withdraw.

. . .

And as I have stated, I'm running out of patience with regard to these different issues -- and I use that word advisedly -- being raised by the clients with regard to any objections they have with regard to their attorneys. And as far as I'm concerned, there are the attorneys [Massey and Sayle] that will represent these men at trial. It's going to have to be one gigantic conflict -- one gigantic and real proven, demonstrated conflict before any of these men will be relieved from representation in this case. There will be no more perceived conflicts, no more unfounded, wild allegations raised through correspondence, no more dissatisfaction with how my attorney is handling my case for anybody to be relieved in this case.

These are the attorneys, gentlemen. You either work with them or don't. It's up to you. But they're the men that are going to be representing you at trial. . . . [emphasis added].

The court also, consistent with prior practice in this case, authorized an initial $1,000 for investigative services and conditioned any further compensation on an itemized showing of necessity by the investigator. Massey stated he preferred to use his own investigator rather than a third attorney; the investigator was Arthur Anderson, the same investigator originally hired by counsel in this case. Thereafter, for some reason, the trial court entered two orders to that affect. An order filed August 11, 1995, allowed Morton and Garrett to withdraw and appointed Attorneys William Massey and Harry Sayle; an order filed on September 29, 1995, permitted counsel and Glenn Wright to withdraw.

On August 11, August 31, and September 27, 1995, the trial court authorized additional compensation for investigative services. In a hearing on August 11, 1995, due to his recent appointment, Massey requested and was granted a trial continuance until January 8, 1996. Massey informed the court that there still remained some discovery to be had in the case and that his investigator had been working diligently on the matter.

11

Like previous counsel, Massey and Sayle filed numerous pretrial motions on behalf of the appellant. In a hearing on November 17, 1995, Massey informed the court that he had filed all the necessary and appropriate pretrial motions. On December 19, 1995, Massey filed a motion to withdraw as counsel. Counsel's motion explained that "his relationship with [Carruthers] has deteriorated to such a serious degree that he can not provide effective assistance as required by state and federal law. . . Counsel's professional judgment cannot be exercised solely for the benefit of Defendant, as counsel fears for his safety and those around him. As such, defendant cannot have effective communication with counsel to discuss the case and counsel cannot discuss strategy and legal options with Defendant." Attached to this nine page motion are several letters Carruthers mailed to counsel in late November and early December 1995. In these letters, Carruthers accused counsel of lying, threatened counsel, and candidly expressed his overall dissatisfaction with the way counsel handled his case. Excerpts from these letters are quoted below:

> [Letter dated November 22, 1995] You have violate[d] the code of ethics by lying to me and my co-defendant James Montgomery that the prosecutor Jerry Harris had a plea bargain of 25 years. We both declined your offer and found out later that you lied along with attorney J.C. McLin and Harry Sayle. I will will [sic] and report you to the board of professional responsibility ethic misconduct [sic]. I want your dishonesty, fraud and deceit to be exposed and acknowledged. You must withdraw from my case before you further prejudice my case. I'm not going to let you deny me a fair trial. I'm asking you as nice as I can to stay away from me. You have less than 72 hours to withdraw from my case, or I will do what I would have to do; [emphasis added]

> [Letter dated December 2, 1995] I want to make this statement that you are about to cross a [sic] innocent man out of his life. I hope you can live with that. You and your friend are the ones that are in a [sic] organization, and you'll [sic] are all a threat to the black men, but make this one your best one, because you deserve it! you have practice [sic] law 15 years and you got to look good, because you can't keep doing this forever. You save the best for last. P.S. This is your last one! [emphasis added]

> [Letter dated December 5, 1995] You have violated several ethic codes with your style and tactics. I don't know if you want to find another profession or not. This one Black man that won't allow you to walk around pride [sic] with you [sic] head up high. I want your license to practice law revoke [sic] or suspended. I don't know how far you plan to play this game but I'm serious. I should be seeing you soon, and I don't know what you are expecting. I promise it won't be that same old sweet smooth talking. It better be some actions around your words. Life is to [sic] short to be playing games with you. Read what the Legal Medical Dictionary has to describe it. You need to get your sorry but [sic] over here to this jail house and tell me what kind of strategy you have for trial Mr. Slick Talker;

[Letter dated December 6, 1995] I want to see you in [sic] your investigator over at the jail as soon as you receive this letter with a full report and transcribe interviews from witnesses. Please do not come with anything that isn't proper, because if it ain't right you will have to do it again. I'll be looking for you soon. Everyday until my trial date you need to send somebody over here to keep me informed of your progress.

[Letter dated December 7, 1995] You are one white boy i don't even worry about. Your brains are going to get your slick racist ass in a whole lot of trouble. All I tell you is to do you [sic] want to do, and I'll do what I HAVE TO DO! Point blank!; [emphasis added]

[Letter dated December 15, 1995] I've tried everything in the world to be fair with you racist CRACKERS! I'm telling you now there will be no turning back the hands of time. You have violated my rights to equal protection, and there will be no COMPROMISING! I don't know if you are on that COCAINE again but don't let the drug alter you [sic] ability to see the truth and no [sic] the truth. I will not except [sic] anything other than the truth. I realize you boys went to school to be professional liars, but I'm not having it.

Also attached to the motion is a statement from Massey's secretary describing Carruthers's abusive and threatening tone during her telephone conversations with him:

I received a collect call from Tony Carruthers . . . on December 13, 1995. . . . It was then he started screaming and cursing, most of which I couldn't understand. One part I did understand and remember was that if he got close enough to Bill [Massey] he was going to whip his white ass. He repeated this several times. The way he was screaming and yelling really scared me. I believe he was very serious in his threats. I told him that I wasn't going to listen to his threats and he said "F--k you, too, you whore," at least twice before I started to hang up. [emphasis added]

On December 19, 1995, the trial court held a hearing on pretrial motions, including counsel's motion to withdraw. Before counsel presented arguments, the judge made the following statements for the record:

A couple of statements I need to make for the record before we begin the hearings that were scheduled today, the cases, in fact, set for trial on the 8th of January.

My first statement is that all statements that these defendants need to make to this Court can and will be made through their attorneys. They are represented by very experienced, highly effective, excellent trial attorneys and anything they need to say, with regard to their trial, will be addressed to me through their attorneys. And if there are any disruptions or problems -- disruptions caused by the defendants in the process of these hearings, then they will be removed to the room behind this door, and we'll continue with the hearings in their absence.

Secondly, the letters that I have received from Mr. Montgomery and Mr. Carruthers over the past several months I have diligently tried

13

to maintain. I've handed them all over to the clerk's office. They've filed them all in one of the clerk's files. We have dozens if not hundreds of letters from these two defendants over the past several months. I've opened each one. I've read each one. I've tried to give copies to defense counsel. If I've not done that I've certainly made them available by putting them in the jackets. There's been no secret as to the content of any of the letters.

About a week ago I received a letter from one of the defendants, Mr. Carruthers, in which he told me that he was going to send me an envelope full of roaches from the jail. I guess to -- I guess to suggest that there is a roach problem in the Shelby County Jail or whatever. But my job description does not include opening letters of that sort. So, for the record I will no longer open any letters from either of these defendants. They have from that day and will continue to be put immediately in the trash. If they have anything to say, they can, again, address me through their attorneys. They're represented by excellent counsel, and they can send letters to their attorneys, and their attorneys can then address me on anything that relates to this case.

The court then heard statements from Massey concerning his motion to withdraw.

I would just say I don't need to, I don't guess, repeat word for word what's in [my motion]. I would just say that in 15 years of practicing law, I have never ever made a motion of this nature. I have never -- I've never found it difficult to advocate on behalf of a case. I wouldn't find it difficult to advocate on behalf of this case. I do at this point, however, find it very difficult to advocate on behalf of Mr. Carruthers. And that is simply because he's made it that way.

If I were receiving letters that merely stated I was incompetent and that I wasn't handling his case right, and those type letters -- we all get those time to time -- I don't mind those. Those don't bother me.

When I have letters that come to me that are threatening, when I have telephone calls that come to my office that are threatening the safety of me and my staff and those around me, I have real problems with that.

It's gotten so bad, Your Honor, that my secretary is having nightmares. The last call Mr. Carruthers made is Exhibit E to this verified motion. She called me in absolute tears crying uncontrollably, hysterically crying over his antics. That's the same way he's been doing me. I just haven't broken down and started crying about it.

But I do have very, very strong, such strong personal reservations as I have never experienced before as an advocate. Your Honor, in advocating cases, particularly capital cases, I find the first thing I have to do to be persuasive is to believe. I have to believe and I have to feel. Because if I don't believe and I don't feel and I'm not sincere, I cannot impart that to a jury. They see my insincerity. They just see words, a parrot-like proficiency as opposed to feeling. They don't act on that. They shut that out. That's been my experience. And I don't believe that that feeling, I know that I can't advocate. I've lost my will to advocate on this case. I don't have any doubt about that at this point. I don't have any doubt. I'll tell you as an officer of this court. I don't have any doubt that would be a major problem.

And despite Mr. Carruthers threats and antics, I care for the integrity of the system. I care that his rights are protected even when he tries to destroy them himself and impair them. And I don't know what the Court's answer is. I know that the Court is in a very difficult position here.

Obviously, it's very clear what the ploy is. It's very clear that we're never going to get to trial like this. And if we do, then there's going to be a record made for ineffective assistance of counsel. And they believe, Mr. Carruthers believes, that doing all of these things is

going to make him a record, as opposed to doing things from a legal standpoint in the courtroom.

The trial judge responded:

> In my opinion, to try to make the record reflect as clearly and accurately as possible the fact that the system is doing everything it can to make sure that Mr. Carruthers is properly and thoroughly represented in this case.
>
> <u>And Mr. Carruthers may step out to the back. He just was pointing to Mr. Massey with some sort of threatening gesture.</u> And he's going to sit in the back for the remainder of this hearing. Put him in the back room and keep him back there. Lock the door. Mr. Montgomery, you will join him in a minute if you choose to conduct yourself in that manner as well.
>
> The system has done all it can, in my opinion, to make sure that Mr. Toney [sic] Carruthers is well represented. And I've tried to be as patient as I can be in listening to the concerns of defense counsel and investigators in making sure that no conflict existed in the representation of either of these men.
>
> The specific reasons, the narrow specific reasons for the excusal of the previous attorneys and investigators differ a little bit from those complaints that Mr. Massey has raised today. And so when Mr. Massey says "That just because I'm the 4th or 5th attorney in line doesn't mean that I now have to be stuck, in effect, in representing him just because others have been relieved and the Court is anxious to get the case tried. My complaints are as valid as theirs were. And if they were relieved, then I should be relieved as well." And I understand that position. But first of all I'll respond to that by saying their complaints were a little bit different, and I'm not going to go through them on the record now. The record is clear in those instances. One envelope is sealed with several letters that will reveal what those complaints were and the complaints from attorneys prior to that were a little bit different in nature. Not to minimize the seriousness of Mr. Massey's complaints, but those complaints were a little bit different. And so it's not that he just happens to be the 5th attorney in line, and he's the one that is going to quote, get stuck, representing Mr. Carruthers. Their complaints were a little bit different. And factually there are some distinctions that can be drawn between the complaints that they had and the complaints that you've voiced.

Mr. Massey: Your Honor, is the Court finding that my complaints are of a less serious nature than those previously made?

The Court: Yes. Yes, I am.

Mr. Massey: The threats of physical bodily harm?

The Court: Yes, I am. And I'm not minimizing those threats. And I understand that the threats that your secretary received affected her, and I don't doubt that at all. But I do find that they are different --

Mr. Massey: Threats I received.

The Court: And that you've received, certainly. But I think they are different and less serious in nature and not such as would prevent you from going forward in this case. [emphasis added]

15

The trial judge stated that he was "much less receptive to these sorts of arguments than [he] was a year ago when the first set of attorneys came in wanting to be relieved." He also stated that Carruthers never requested to proceed pro se, and that he was "not going to force a man to go pro se in a capital case if he doesn't want." The trial court denied Massey's motion to withdraw. The trial court, however, did authorize additional funds for investigation and mitigation.

In another hearing on January 2, 1996, Massey again requested permission to withdraw. Massey informed the court that he had continued to receive threatening letters at his home and was concerned for his daughter's safety because Carruthers referred to the car she drove. Massey stated that he cared more about Carruthers receiving a fair trial than Carruthers himself did, but that due to the actions of Carruthers Massey did not believe he could responsibly represent him. He told the court, quite clearly, "I don't want to represent this man. I can't represent him. I won't represent him."

During this hearing, the prosecution, for the first time, voiced its position on the matter. The prosecutor recounted the procedural history of the case, that several extremely competent and professional attorneys were forced off the case by Carruthers, and stated:

> And if a defendant, Your honor, can threaten the system, if he can manipulate the system by threats, by letters, I'm not sure if that's what the makers of the constitution meant when they sat in Philadelphia and they said, look, let's let every defendant have a fair trial. Let's let him have a lawyer. Let's let a jury be over here. Let's let him have a judge; that's fair. Let's let no man be accused of a crime, will not go to trial, unless he receives a fair trial. Let no man be convicted -- but the framers of the constitution, Your Honor, had not met Tony Carruthers.

The prosecutor understood Massey's predicament, but told the court it simply could not allow Carruthers to continue the trial of the case any longer. The court, again, denied Massey's request. The court's main concern, apparently, was that it could not just keep granting these requests to withdraw; there had to be an end to it. The court noted, though, that everything that had taken place during the course of the proceedings had been recorded so the appellate courts "can understand why we're

16

in this dilemma that we're in today. So that they can understand why Mr. Carruthers would be representing himself . . . so that they can have the full understanding." At one point during the hearing, Carruthers stated to the court that he did not want Massey representing him because Massey was on cocaine. The record also reflects that during the hearing Carruthers was glaring at Massey and gritting his jaw.

Although the trial court previously mentioned that it was not going to force Carruthers to represent himself in this capital trial, after further thought the court, citing federal case law, stated that Carruthers had two options remaining, either proceed with Massey and Sayle or proceed pro se. The record clearly reflects that everyone involved in this case, with the apparent exception of Carruthers, was particularly frustrated with the turn of events. The court, for the record again, stated that in its opinion all of the attorneys appointed in this case were excellent trial lawyers and had fully performed their duties, including filing all relevant motions and thoroughly pursuing the investigation.

Thereafter, Massey sought a T.R.A.P. 10 extraordinary appeal to this Court. In an order dated January 8, 1996, this Court recounted some of the statements from the letters written by Carruthers, including a description of the car driven by Massey's daughter, an allegation that Carruthers' friends could discover details about Massey like the color of his toothbrush in his home, and a statement to the trial judge accusing Massey of using cocaine. After noting that several other attorneys were allowed to withdraw in this case, the Court stated:

> This Court is of the opinion that the attorney-client relationship, which may have previously existed, has deteriorated until such a relationship does not exist between Carruthers and Mr. Massey. Also, the circumstances of this case make it impossible for Mr. Massey to ethically represent Mr. Carruthers. Carruthers has proclaimed that he will do bodily harm to Massey. He has in essence and in fact threatened Massey with death. Carruthers, who has a history of violent conduct, is apparently a member of a gang. All of his correspondence to Massey carries a drawing of a lidless eye that watches from the top of a pyramid. Moreover, Massey's family is filled with fear and anxiety due to the threats made to Massey; and Massey's secretary, who has had dealings with Carruthers by telephone, likewise has fear and anxiety based upon her conversations with Carruthers and the threats made against Massey. Given these circumstances, Mr. Massey had no alternative but to seek permission to withdraw as counsel. He is supported in this endeavor by the Disciplinary Counsel for the

17

Tennessee Supreme Court Office, which advised Massey that he was ethically required to withdraw as counsel, and, if the motion was denied, he was required to seek relief in the appellate courts.

. . .

Given these facts and circumstances as well as the relevant provisions of the Code of Professional Conduct, which governs the conduct of lawyers in the State of Tennessee, Mr. Massey was entitled to be relieved as counsel of record for Mr. Carruthers. If there ever was an amicable attorney-client relationship, it was eradicated by Mr. Carruthers's conduct in writing the letters aforementioned and threatening to do bodily harm to Mr. Massey the first time he saw him. Today, Mr. Massey and Mr. Carruthers are at odds and their differences are irreconcilable. Furthermore, Mr. Massey, who emphatically denied any misconduct or addiction to drugs, must attempt to protect his family, secretary, and himself from physical harm as well as protect himself from further disciplinary complaints.

This Court granted Massey's request and allowed him to withdraw. Interestingly, in a hearing on January 8, 1996, the trial court allowed counsel to withdraw, but this was apparently before the judge received a copy of this Court's order. That day, Massey had filed a supplement to his motion to withdraw, and attached seven more letters Carruthers mailed to counsel's home and business in late December 1995. These letters were also attached to the application Massey filed in this Court. Although Carruthers was aware of the motion to withdraw filed by Massey, he persisted in sending even more letters to counsel which only added ammunition to counsel's cause. In these letters, Carruthers again, in an accusatory and threatening tone, expressed his dissatisfaction with Massey's representation:

[Letter dated December 19, 1995] Hey Mr. Attorney you sit around in your big tie office in Raleigh and ride around in your 1994 Ford Probe. I can't even get 50 full hours of investigation out of you or your sorry investigator but that's okay, because I have investigator [sic] myself and they don't charge me anything and a couple [sic] of days I'll be able to tell you anything you need to know even the color of a toothbrush they are good I'm telling you they aren't from Memphis so you know they must be pretty good. P.S. Let me know when you are ready to sit down and talk to them I'll send them over to help. [emphasis added]

[Letter dated December 23, 1995] I've tried everything in my power to wake you up but you are determine [sic] to cross me. We'll let the games go on. Let your conscience be your guide!

[Letter dated December 26, 1995] This is the last black man in Memphis, TN you will cross so make it good WHITE BOY!

[Letter dated December 27, 1995] Since you refuse to contact my witnesses or any of the state's witnesses I will have them come by your house or call you. So I hope this will be a more effective way to get your legal assistance. I hope you don't pull weapons or scare them away. If so then let em know up front. [emphasis added]

[Letter dated December 27, 1995] Look BOY you don't have to except [sic] my calls or come to see me. I will put it on paper what I want your sorry ass to do. You don't have to do it if you don't want. Your brains aren't as big as you think. It's not a game you are it [sic] my life. i can't live but once, and I promise you I won't let you take it just so you can ride around town and brag. This is where I stand fair trial or nothing. You are one crazy white boy or just a send out. Like I told you, let your conscience be your guide.

[Letter to trial judge dated December 27, 1995] I have once, twice, and even three times wrote you and made you aware that my attorney of the record William D. Massey is ineffective in his assistance of counsel. We have disagreed on more than one occasion about which rights of mine where [sic] being violated. He Mr. William D. Massey has refused to properly investigate my case. He refuse to file prosecutorial misconduct charges against the Asst. Attorney General Jerry Harris. He also is addicted to cocaine a [sic] illegal controlled substance which affects his ability to practice law. This is a disgrace to the judicial system.

The record also reflects that Carruthers filed a disciplinary complaint against Massey with the Board of Professional Responsibility.

Just before the start of jury selection, the trial court, again citing federal opinions, ruled that Carruthers had forfeited his right to counsel by his egregious conduct and compelled him to proceed pro se. The trial court, however, appointed Massey and Sayle to serve as "elbow counsel." Despite Massey's continued position that the attorney-client relationship had completely deteriorated, Carruthers informed the court that he tried to reconcile with Massey the weekend before the start of trial. When the judge made his ruling, Carruthers expressed his concerns to the court about proceeding pro se; he informed the judge, in essence, that he had no idea what to do. The judge stated:

Well, those are the perils in going forward pro se. And in my judgment, Mr. Carruthers, as I've said on several occasions, and I don't intend to get back into a lengthy hearing on this issue at this time, but we've had two or three hearings already on this.

In my judgment, and I understand you're stating now that you don't feel capable of going forward and representing yourself. But you need to understand that in my judgment you have created this problem for yourself. You are the author of your own predicament by, in my opinion, sabotaging the representation of you by four previous attorneys. These are now your fifth and sixth attorneys. In my judgment, because of actions that you've taken over the past 18 months, because of actions that you've taken, you are now in this situation.

And so it may well be difficult for you to go forward in representing yourself, but this is the situation that you've created and you're going to have to do the best you can, because there is virtually no option left at this point. To reset it again, history would show would

19

only -- would be a futile effort, because at the eleventh hour with the seventh and eighth attorneys representing you, there would be some other effort, in my opinion, some other manipulation on your part that would then cause those attorneys to come in and want to get off your case. And then we'd reset it and appoint the ninth and tenth attorneys, and the eleventh and twelfth. And there'd be no end to it.

. . .

And so we're going forward and you're going to represent yourself. I understand you're not an experienced attorney. I understand you may well have never gone through a voir dire process before. And that's unfortunate. I wish you had cooperated and gotten along with Mr. Nance a year and a half ago. He was an excellent attorney, has tried many, many cases in these courts, serious difficult cases and done an excellent job.

I wish you had cooperated and gotten along with Coleman Garrett who, in my opinion, is one of the best trial attorneys in this entire state. He's tried many cases in this courtroom and defended individuals remarkably well.

I wish you had cooperated and gotten along with Mr. Craig Morton, and Mr. Glen Wright, and Mr. Harry Sayle, and Mr. William Massey, because I think it would've been in your best interest to have done so. But it's been obvious that you have not. And so for that reason we're going forward.

. . .

It's not easy to make this decision. It's not a decision that I made lightly or take lightly. But I tell you what, if this record isn't complete enough and replete enough with evidence of manipulative conduct and obstructionism, then I can't imagine ever there being a record for the appellate courts in Tennessee that would meet that criteria.

The record indicates that in an effort to waive any conflict with Massey representing him at trial Carruthers wanted to take the stand to apologize and testify that the accusations he made against counsel earlier were untrue. The court noted that this was merely another tactic Carruthers was using and denied the request.

On January 9, 1996, this Court filed an addendum to its previous order and ordered that Massey be completely relieved of any representation of Carruthers, including providing assistance as "elbow counsel." On January 11, 1996, during voir dire, the state requested a trial continuance due to the hospitalization of one of its material witnesses. The court rescheduled trial until April 15, 1996. Carruthers made an oral request for appointment of new counsel. The trial court denied the request, reiterating what it had stated earlier:

The system will not be held hostage by Tony Carruthers, and to go through another round of attorneys will be doing just that, because history suggests, as you've done in the past, that is if new attorneys were appointed and spent the time and investigated, the effort to get ready on this case, then at the eleventh hour something would happen, some allegations would be made that would undermine their ability to represent you, they'd ask to withdraw, we'd be back in the same

situation that we were in with Mr. Larry Nance, with Mr. Coleman Garrett, with Mr. Bill Massey, all three of whom are outstanding criminal defense attorneys. All three of whom were fully capable of representing you, and all three of whom had to be relieved because of your actions.

And in my judgment, enough is enough. And because of your actions, these attorneys are no longer representing you and, therefore, you will be representing yourself. You have ample time to prepare. You have access to legal opinion from Mr. Sayle. You have the file. You have the rules. You have a jury consultant. You have an investigator. And this is the manner in which we're going forward.

On January 19, 1996, the trial court entered orders allowing Carruthers to hire a jury selection consultant and an investigator. During a hearing on January 16, 1996, the appellant informed the court that he had contacted a new investigator to assist him. The court talked to this new investigator about the nature of the case and questioned whether he would be able to proceed to trial on April 15, 1996. The investigator informed the court that he had discussed the matter with the appellant and was in the process of assembling an investigative team. He stated that he had the files that had already been prepared and indicated that he would complete the investigation by that date. The court allowed John Billings to assist the appellant and authorized Billings to contact the court if additional funds were needed. The court also cautioned the appellant that this would be the last investigator appointed in this case.

In February 1996, Carruthers filed two more written motions for appointment of counsel, which were also denied by the trial court for the same reasons mentioned earlier. In a hearing on February 20, 1996, the court recounted the lengthy procedural history of this case and cited several federal opinions discussing a defendant's forfeiture of counsel due to defendant's hostile actions. The court stated that "it will be apparent to anyone who objectively views this situation that Mr. Carruthers is not being denied right to counsel." Also during the hearing on the 20th, the court entertained some of Carruthers's pretrial requests for expert services and discovery. Although appellant represented himself at this point, the record reflects that the trial judge continued with a professional approach in this matter and made informed decisions after allowing the appellant ample opportunity to make his arguments in open court on his pretrial requests. The record suggests that the judge provided Carruthers with added guidance and granted him and his investigator

considerable latitude during the pretrial hearings. Hearing dates were continued several times to allow the appellant additional time to prepare for his arguments. Moreover, at times when Carruthers requested an ex parte hearing, the state voluntarily left the courtroom so the appellant could speak freely to the judge.

The court eventually allowed Sayle to withdraw as elbow counsel due to appellant's lack of trust and confidence in counsel and his personal attacks against Sayle. The court denied Carruthers' motion for court paid accident reconstruction services, but granted his request for a forensic pathologist. On March 4, 1996, the trial court entered an order denying another request by Carruthers for appointment of counsel. Also on March 4, the court heard arguments from Carruthers on all of the remaining pretrial motions he had filed. As the trial court noted and as the record reflects, the appellant filed various pretrial motions that appear to be similar or the same as those filed by counsel before they were allowed to withdraw. In addition, the record reflects that the appellant obtained the assistance of another attorney to prepare some of these motions on his behalf. The appellant intended to retain this attorney to represent him, but apparently this never materialized. Among these motions are motions for severance, individual voir dire, suppression of evidence, and general discovery requests. Incidentally, once the court removed the final attorney from Carruthers''s case, counsel for Montgomery started moving the court for a severance. In fact, almost every time the court held a pretrial hearing on one of Carruthers''s requests, counsel for Montgomery renewed their motion for a severance. These were denied.

Another oral motion for appointment of counsel was denied on April 15, 1996, the day jury selection started. After trial, Carruthers filed yet another motion for appointment of counsel. The trial court appointed Stephen Leffler and Lee Filderman to represent appellant on the motion for new trial and direct appeal to this Court. Even after new counsel were appointed, Carruthers still insisted on filing pro se motions in the trial court. Appellant also wrote letters to the trial judge about issues he wanted to raise in the motion for new trial and witnesses he wanted to call.

22

He also complained to the trial court that his new counsel were inexperienced to handle a capital case.

## FACTS

**Guilt Phase**

The victims, Marcellos Anderson, Delois Anderson, and Frederick Tucker, were murdered sometime between the evening of February 24, 1994, and the morning of February 25, 1994. Their bodies were discovered underneath a buried casket in a cemetery in Memphis, Tennessee, on March 3, 1994.

Michael Harris let his cousin, Marcellos Anderson, borrow his Jeep Cherokee on Wednesday, February 23, 1994. Harris learned early Friday morning, February 25, that his Jeep was destroyed by fire in Mississippi. Harris testified that Anderson stayed with him sometimes during the week and that he would loan Anderson his car once or twice a week. He testified, however, that he did not know what Anderson did for a living.

At about 2:40 a.m. on February 25, 1994, Archie Yancey, an officer with the Desoto County, Mississippi Sheriff's Department, observed what appeared to be a "Jeep vehicle" engulfed in flames in a field about twelve miles south of the Tennessee-Mississippi state line. According to Officer Yancey, the way the vehicle was burning suggested that it may have been torched.

Jean Tucker testified that her son, Frederick Tucker, was seventeen years old when he was killed. She last saw him around noon on February 24, 1994. Tucker also testified that her oldest son, Andre Tucker, was murdered on January 13, 1995.

Ola Jean Anderson was a friend of Marcellos Anderson. She testified that she saw Anderson with James and Jonathon Montgomery sometime around 4:30 p.m. on Thursday afternoon, the 24th. Ola Jean Anderson was standing on the street talking to Anderson, who was in a white Jeep with another person, when Montgomery and his brother approached and got into the Jeep.

Laventhia Denise Anderson Briggs is a niece of Delois Anderson and cousin of Marcellos Anderson. Briggs lived with Delois and Marcellos Anderson. She testified that she did not know what Marcellos did for a living, but she did state that he had been shot in July 1993. Briggs telephoned Delois at home from a friend's house shortly after 8:00 p.m. on the 24th. Someone answered the phone but did not speak. Briggs testified that she said "hello" several times but received no response. She hung up the phone and tried calling back, but no one answered the phone. Briggs went home about thirty minutes later and noticed that Delois had been there "because her things were there and she had left her food." Briggs assumed Delois would be back soon because she left her car, purse, cigarettes and keys. Briggs went to sleep and was awoken about 3:30 a.m. by a phone call from Michael Harris asking if Delois was home. She had not returned, nor was Marcellos home. A missing person report was filed the next day. Briggs testified that Marcellos wore a "big diamond ring," a watch and a beeper. She also testified that a pillow case was missing from Delois' bed.

Charles Ray Smith, a convicted felon, testified on behalf of the state. In the fall of 1993, Smith was incarcerated at the Mark Luttrell Reception Center in Memphis. Appellants Carruthers and Montgomery were also incarcerated there at that time. According to Smith, sometime during the early part of November 1993, Smith and Carruthers were on work detail together at the cemetery where the victims were discovered. Part of their duties included placing coffins in the grave sites. According to Smith, at some point Carruthers stated "that would be a good way, you know, to bury somebody, if you're going to kill them. He said, you know, he said, you know, if you ain't got no body, you don't have a case." Smith testified that he heard Anderson brought Carruthers back to jail from furlough one day. Montgomery apparently saw Anderson with Carruthers. Smith overheard Montgomery ask Carruthers about Anderson. Smith testified that he heard Carruthers tell Montgomery both Anderson and Andre "Baby Brother" Johnson dealt drugs and had a lot of money. Carruthers said when he and Montgomery got out of prison they could rob and "get" Anderson and Johnson.

24

Smith further testified that upon his release, he approached Anderson and Johnson and told them what he had overheard. Thereafter, Montgomery was released and Smith saw him on the street sometime in January 1994. "When I had seen him, he told me that, you know, [Johnson] is trying to get me killed because he said I went back and told [Johnson] that he supposed to be robbing them, what he told me." Smith testified that he saw James and Jonathan Montgomery get into a white Jeep Cherokee with Marcellos Anderson and Fred Tucker on February 24, 1994. Smith also saw Jonathan Montgomery "hanging around" by himself from about 5:00 to 6:30 p.m.

Smith testified that he received a call from Johnson around 4:00 a.m. on February 25, 1994. Johnson said Anderson was missing and asked Smith if he had seen him. Smith, Andre Tucker and Johnson drove around looking for Anderson. Smith testified they saw lights on at James Montgomery's house, so when Smith returned home around 5:00 a.m. he telephoned Montgomery, despite the fact that he and Montgomery did not have a friendly relationship. Carruthers answered the phone and Smith asked to talk to Montgomery. Smith asked Montgomery if he knew Anderson's whereabouts because he was the last one he saw with him. Smith also informed Montgomery that Anderson's Jeep was found burned in Mississippi. According to Smith, Montgomery said he did not feel like talking, that "We'll talk tomorrow," and hung up the phone.

On cross-examination, Smith acknowledged that he did not have a good relationship with James Montgomery. Smith could not remember the specific date he heard Carruthers and Montgomery talking about Anderson. Nor could he remember if there were any other inmates present during the conversation. Smith also acknowledged on cross that prior to his release from prison in the fall of 1993 he and Carruthers "had a fallout" and did not "talk much anymore" because he learned that Carruthers and Montgomery "was plotting to do something" to him.

Nakeita Montgomery Shaw testified that her cousins, James and Jonathan Montgomery, and Anderson and Tucker stopped by her house to visit around 4:30

25

or 5:00 p.m. on February 24, 1994. They arrived in a white Jeep Cherokee. Benton West, another of Shaw's cousins, and Shaw's four children were also present in the house. Shaw testified that the four men entered the house and went down to the basement. James then came back upstairs and asked Shaw if she could leave the house for a while so he could take care of some business. West, the children, and Shaw all left the house. West told Shaw that he would never visit her again if James was in the house.

When Shaw returned later that evening, Carruthers and James Montgomery were the only individuals she saw in her house. Montgomery asked if she could leave for a little longer. When she returned home again, sometime before 10:00 p.m., James Montgomery and Carruthers were still there. The white Jeep, however, was gone, and Shaw did not see or hear Anderson or Tucker. Shaw testified that Montgomery told her to put her kids to bed upstairs and stay there until he said otherwise. When Montgomery told her he was leaving she went back downstairs and saw Montgomery, Carruthers, Anderson and Tucker walk out the front door. Shaw locked the front door behind them. She testified that the Jeep had returned to the front of her house. The next morning, James, Jonathan, and Carruthers returned to Shaw's house.

After the police started their investigation in this case, James Montgomery told Shaw that she did not have to talk to the police about anything. Montgomery also told her later that if he was going to be put to death for something he did not do, then "all of us needed to die." Shaw testified that she subsequently moved to her mother's in Milwaukee with her children and Jonathan Montgomery because she had received death threats. In early April, Shaw was questioned by the Milwaukee Police Department regarding the evening of February 24, 1994. She informed the officers of Jonathan's whereabouts. When she was questioned by the Memphis Police Department at a later date, she mentioned that Anderson and Tucker's hands were tied behind their backs when they left her house. She testified that she has been afraid for her life, and during her testimony she stated that she did not see Anderson and Tucker restrained in any manner. She informed the police that James

26

Montgomery threatened her and told her she could be an accessory. Montgomery also told Shaw that he did not want to have to hurt her.

On cross-examination, Shaw testified that she was not afraid of James Montgomery but, because of her involvement in this case, she was still scared. She testified that James was living with her in February 1994, and that it was not uncommon for him to come and go as he pleased. James also brought friends by the house occasionally. Shaw testified that she did not care for Anderson, because he dealt drugs, and told Ben West that she did not want Anderson in her house.

Benton West was at Shaw's house on February 24, 1994. He testified that around 5:00 p.m. James and Jonathan Montgomery, Anderson and Tucker stopped by the house in a Jeep. West spoke to Anderson and then all four men walked downstairs to the basement. West testified that a couple of minutes later Shaw came into the kitchen and told him that she thought "they" were being kidnapped. West then took Shaw's children and left the house. West saw Shaw two days later, and she stated, "I hope didn't nothing happen to them or nothing like that." On cross-examination, West testified that he did not see any weapons or notice anything unusual about the four men as they came inside the house. He also testified that Shaw never told him she was afraid of Anderson or that she did not want him in her house.

Jimmy Lee Maze, Jr., another convicted felon, testified on behalf of the state. Maze received two letters from Carruthers in the summer of 1993 while Carruthers was incarcerated. In the first letter, Carruthers mentioned he had "a master plan" and "all the right ideas and the support to back it." In his second letter, he stated he was trying to get transferred to Mark Luttrell Reception Center. He also wrote: "I can't wait to make those streets pay me"; "If you really want to be rich, take time out when you get out to listen to my plans and goals"; "Everything I do from now on will be well organized and extremely violent"; "I have big plans for us and there isn't anything they can do about it". Maze also testified that in December 1993, he and his brother and Carruthers were riding around together. They happened upon a

scene where a car had been shot in front of Delois Anderson's house. Jonathan Montgomery was at the scene, and when they arrived Montgomery got in the back seat of the car with Carruthers. Maze testified that Carruthers said "it would be the best time to kidnap Marcellos," once James Montgomery was released from custody. When Montgomery asked who Carruthers was talking about, Anderson or Johnson, Maze observed Carruthers bump Montgomery with his elbow. A couple of weeks later, on New Year's night, Maze saw Carruthers loading three antifreeze containers into a car. Maze got in the car with Carruthers, and as he was about to light a cigarette, Carruthers told him not to do it because there was gasoline in the antifreeze containers.

Terrell Adair, a convicted felon, testified that prior to his incarceration he was involved in the sale of cocaine with Marcellos Anderson and Andre Johnson. Adair was present when Charles Ray Smith warned Anderson and Johnson about Carruthers and Montgomery. Sometime in February 1994, Carruthers and Montgomery approached Adair and Johnson on the street. Montgomery asked Johnson and Adair "why did we feel like he was trying to do something, something to one of us, because if he was trying to do something to us he would come around and kill our whole family." Montgomery told Adair and Johnson that he already had someone else targeted, and that he was going to take this person's money and drugs. Montgomery also said, "if the police didn't have no body, they wouldn't have no case." Adair stated that this was the first time he met Montgomery. Adair also testified that Anderson always wore an $1,800 ring. Adair admitted to having been shot during a drive-by shooting, allegedly something to do with the drug business. He also stated that Anderson had previously been shot in a drive-by shooting.

Andre Johnson ("Baby Brother") testified that he, Marcellos Anderson and Terrell Adair were best friends and sold cocaine together. According to Johnson, Anderson was known to carry about $5,000 or $6,000 cash on his person. Johnson also stated that Anderson had about $57,000 stored in his mother's attic. Johnson, Anderson and Adair all wore similar rings. Johnson testified that when Carruthers was released from jail in the fall of 1993, he, Anderson and Adair each gave

28

Carruthers $200, which apparently was customary when someone they knew was released from jail. Johnson stated that Anderson transported Carruthers to and from jail when he was released on furlough. Johnson testified that after Carruthers was released from jail Charles Smith warned him, Anderson, and Adair to watch out for Carruthers and Montgomery. Johnson said Anderson did not take Smith's comment too seriously. According to Johnson, Anderson acted friendly toward Carruthers and trusted him. Johnson also testified that he saw Montgomery after he was released from jail. Montgomery stated "this is my neighborhood" and asked Johnson whether he wanted to go to "war" over it. Montgomery also told Johnson, sometime later in front of Johnson's house, "we already got our man staked out . . . If we wanted some trouble or something, we got you right now. We'd kill your whole family."

On cross, Johnson also admitted he had been shot during a drive-by shooting. Anderson had also been shot in a similar manner. Johnson also testified that he and his associates had previously been involved in a drug war with a rival organization caused by differences in pricing. Upon questioning by Carruthers, Johnson stated that when Carruthers was released from jail he mentioned something to him about a master plan and making a million dollars in about two months.

Chris Hines had known the appellants since junior high school. About 9:00 p.m. on February 24, 1994, Jonathan Montgomery visited Hines at his home. Hines testified that Jonathan told him he killed some people and stole their money; he said, "Man, a n----r got them folks . . . Cello and them." Jonathan said "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000." Jonathan asked Hines to take him to the cemetery. Hines refused, but allowed Jonathan to borrow his car. Although Jonathan said he would return the car in an hour, Hines did not see it again until the next morning. Hines also testified that he called James Montgomery about 11:00 p.m. that same night. Hines was looking for his car. James told him he did not know where Jonathan was, but that he would probably not get his car back until about 4:00 a.m. because Jonathan had to drive James to his girlfriend's house. Jonathan, James and Carruthers eventually returned his car around 8:30 a.m. the next morning. The car was muddy but the three defendants

took the car to clean the exterior and vacuum the interior, including the trunk. Hines testified that Jonathan told him again the morning of the 25th that they killed some people. According to Hines, Jonathan was paranoid and nervous. Jonathan apparently left the carwash and Carruthers and James asked Hines what Jonathan had told him. Hines said Jonathan told him nothing. Several days later James offered Hines an AK-47 assault rifle for his protection. James said the gun had blood on it, which was slang meaning someone had been shot with it.

On cross-examination, Hines stated that when the three defendants returned his car the next morning, James and Carruthers left. Hines stated that he saw James and Carruthers about 2 ½ hours later, at which point James asked Hines why his car was so muddy. Hines testified that James told him he would take him to get his car washed as soon as he got his check. Hines stated that his car was dirty when he let Jonathan borrow it. Hines further testified on cross that Jonathan told him that "I had to kill them folks." He stated that James asked him what Jonathan had told him and said that they needed to find out what Jonathan had done. Hines also stated on cross that neither James nor Carruthers directed the man washing the car to clean anything in particular.

Orlandus Buddy Sesley, an employee with the Tennessee Department of Correction, testified about the operation at the Mark Luttrell Reception Center in Memphis, where he was stationed. The reception Center serves as a processing center for prisoners before they are transported to or released from the various penitentiaries across the state. Sesley worked as a counselor assisting and orientating prisoners back into society before their release. Sesley counseled the appellants and Charles Ray Smith. Carruthers was released from custody on November 15, 1993, Smith on December 15, 1993, and Montgomery on January 11, 1994. Sesley testified that both Smith and Carruthers were assigned to work release at a graveyard before their release from custody. Sesley further testified that Carruthers was removed from the cemetery detail in October and given light duty work inside because of a medical problem with his hand or wrist. Sesley authorized furloughs for inmates which allowed a prisoner to leave custody for three days to

make arrangements for release. Carruthers was granted three furloughs, the last occurring October 1, 1993. Sesley testified that Montgomery arrived at the Mark Luttrell Reception Center on November 4, 1993.

On March 3, 1994, Detective Jack Ruby of the Memphis Police Department accompanied Jonathan Montgomery to the Rose Hill Cemetery on Elvis Presley Boulevard. Jonathan directed Detective Ruby to the grave site of Dorothy Daniels, who was buried on February 25, 1994. This grave site was located six plots away from James Montgomery's cousin's grave site. Ruby obtained a court order permitting disinterment of the casket from this grave. Along with the police officers, two anthropologists and two medical examiners assisted in the removal of the bodies. The casket containing the body of Daniels was located in a plywood box inside the grave. Below this box, underneath several inches of dirt, they found another single piece of plywood. The bodies of the three victims were discovered underneath this piece of plywood lying in a pit that had been dug further down in the dirt. The two male victims were on top of the female victim and all three victims were bound.

Patrick Williams, an employee of the Rose Hill Cemetery, testified that it would have taken two people to remove the empty plywood box that was found in Daniels' grave. This box was placed in the grave the day before the casket was lowered, which would have been during working hours on February 24, 1994. According to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted with the crime scene, the casket of Daniels had not been disturbed after she was buried on the 25th.

Dr. O.C. Smith performed the autopsies in this case. He also assisted in removing the bodies from the grave site. Dr. Smith testified that the female victim was in the bottom of the grave and the two male victims were found lying on top of her. The hands of all three victims were tied behind their backs and, in addition, the feet of Frederick Tucker were bound. Delois Anderson also had a red sock around

31

her neck and Frederick Tucker's neck showed signs of bruising caused by a ligature. Dr. Smith did not find any jewelry on Marcellos Anderson.

Delois Anderson died as a result of asphyxia caused by a combination of factors: 1) difficulty in breathing due to the position of the body, i.e., her head was bent forward and her chin was pressed against her chest, 2) dirt in the mouth and nose blocking the airflow, and 3) trauma from the weight on her body. This victim also suffered trauma before she was placed in the grave. Dr. Smith opined that this victim was strangled two to six hours before death. Also, the victim suffered a more recent wound to the back of her head which could have been caused by a blow from a shovel. She also showed bruising on the elbows, the back of the left shoulder, and the forehead, possibly caused when she hit her head on the bottom of the grave.

Frederick Tucker received a near gunshot wound to his chest which was not instantaneously fatal. He also suffered blunt trauma to his abdomen and head, which included broken ribs, a fractured skull and a ruptured liver. Dr. Smith opined that Tucker was shot and then placed in the grave where the force of compression from being buried produced the other injuries and ultimately caused his death. Dr. Smith further opined that Tucker was alive when he was placed in the grave. Tucker also showed signs of strangulation.

Marcellos Anderson received three gunshot wounds: a contact wound to his forehead, which was not that severe, and two gunshot wounds to the neck, one a near shot severing his spinal cord and paralyzing him from the chest down. None of the gunshot wounds, however, were instantaneously fatal. Anderson also suffered blunt trauma to his abdomen from being buried in the grave.

Dr. Smith opined that each victim was buried alive.

Appellant Montgomery presented no proof, however, appellant Carruthers called several witnesses to testify on his behalf. Albert James Herman, Jr., a health administrator at Mark Luttrell Reception Center, testified that on October 6, 1993, the

32

appellant was granted a job change because of an injury to his left hand. Freddy L. McCullough, a private investigator assigned to this case, interviewed Jimmy Maze prior to trial. According to McCullough, Maze knew Carruthers was talking about a master plan in his letters, but Maze did not know specifically what Carruthers was talking about until Carruthers was released from jail (apparently because the letters Carruthers wrote to Maze did not go into details or mention names).

Alfredo Shaw gave a statement to the police in March 1994. Shaw stated that he saw a television news report about this case and called crime stoppers to provide information. Sometime before the murders, Shaw testified that he was in a three-way telephone conversation with Carruthers and either Terry or Jerry Durham. Carruthers told Shaw he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Shaw told Carruthers, however, that he did not want to get involved. Shaw was in the same jail with the appellants after they were arrested for these crimes. Shaw testified that Carruthers told him how the crimes were committed. Carruthers said he and some other people (he apparently did not mention the other appellants by name) went to Delois Anderson's house looking for Marcellos and his money. Marcellos was not there so Carruthers told Delois to call Marcellos and tell him to come home, "it's something important." When Marcellos arrived, the appellants forced the victims (apparently Tucker arrived with Marcellos) into the Jeep at gunpoint and drove them to Mississippi where they shot Marcellos and Tucker and burned the Jeep. The appellants then drove all three victims back to Memphis in a stolen vehicle. According to Shaw, Carruthers stated they drove to the cemetery and put Marcellos and Tucker in the grave. Delois started screaming so one of the appellants told her to shut up or she would die like her son, and then pushed her in the grave. Shaw testified about this information before the grand jury in this case.

Carruthers told Shaw that he was not going to hire an attorney because then the state might have learned that they planned the murders in order to steal Marcellos' money. Carruthers also said the bodies would have never been found if "the boy wouldn't have went and told them folks." Carruthers informed Shaw that

Johnson was also supposed to be "hit." Carruthers also stated that two other individuals, Terry and Jerry Durham, were "the main people behind having these individuals killed." Apparently the Durhams wanted revenge because they had previously been robbed by Marcellos and Johnson. Shaw testified that he feared for his safety for having come forward with this information because the Durhams had control over people who were in jail along with Shaw. Shaw testified at trial that he attempted to recant his grand jury testimony and statement to the police because his and his family's safety was threatened by Carruthers. Apparently, Carruthers made arrangements through one of his investigators to have a news reporter interview Shaw about his recantation. The Durhams testified on behalf of Carruthers and both individuals stated that they did not know Shaw nor had they heard of him.

Aldolpho Antonio James testified that he was with Carruthers at a friend's house between 1:00 a.m. and 2:00 a.m. the day before James first saw a news report about this case. On cross-examination, however, James admitted that he did not know the date of this encounter.

Terrance Roderick Carruthers, the appellant's brother, testified that Terrell Adair was shot in a drive-by shooting in December 1993. He further testified that he went to the hospital later that day with Carruthers, Marcellos Anderson, and Andre Johnson to see Adair. According to his testimony, Jonathan Montgomery was not present at the scene nor at the hospital. Carruthers also called Antonio Bateman to the witness stand who testified that he did not see Jonathan Montgomery at the hospital after Adair was shot.

An administrative assistant with the Shelby County Jail testified that Shaw was not in the law library of the jail at the same time as Carruthers in February or March 1994. The conversation Carruthers had with Shaw allegedly took place in the jail library. Carruthers also called several employees of the Shelby County Jail who testified about the various classifications of prisoners and how certain prisoners, such as those in protective custody, are segregated at all times from other classifications of prisoners. Some of these employees admitted, however, that this

34

system is not foolproof and that there could be times when inmates with different classifications could come into contact with one another. Carruthers and Shaw had different classifications.

**Sentencing Phase**

During the Sentencing phase of the trial, the state introduced evidence of the appellants' prior convictions. Carruthers had a previous conviction for aggravated assault, while Montgomery had two previous convictions for robbery with a deadly weapon and one for assault with intent to commit robbery with a deadly weapon. The state also called the medical examiner back to the stand to testify about the pain suffered by the victims. Dr. Smith testified that none of the victims died instantaneously. Each victim suffered as a result of their separate injuries, as well as from the sensation of being buried alive.

Nakeita Montgomery Shaw testified on behalf of Montgomery during the sentencing phase. Shaw and Montgomery were close growing up together. Shaw stated that she loved her cousin very much and asked the jury to spare his life. Mattie Calhoun, Montgomery's aunt, testified that Montgomery was an average student in school. She also stated that Montgomery did not have a meaningful relationship with his father. She also begged the jury to spare his life. Montgomery testified on his own behalf. Montgomery and his three brothers and two sisters were raised by his mother in North Memphis. Montgomery stated that he was five years old when he last saw his father, who was still living in Mississippi at the time of trial. He testified that he pled guilty in his prior cases because he was guilty. He testified, however, that he was innocent in this case. He stated that he spent a little over nine years in the penitentiary for his previous convictions and had secured a job when he was released. Montgomery's son was ten years old at the time of trial.

Bishop R.L. Fiddler had been visiting with Carruthers since his incarceration. Fiddler believed Carruthers was honest and straightforward and a person of quality and worth. Fiddler stated that Carruthers was upset about the deaths of the victims

in this case. Fiddler asked the jury to give Carruthers a chance to live. Tonya Yvette Miller, Carruthers' sister, testified that their mother raised four children on her own. Miller stated that they grew up in one of the worst housing projects in Memphis. Carruthers, the oldest son, had a lot of responsibility as the "man of the household." She loves her brother, but admitted that he had a hot temper. Miller stated, however, that he never planned to do anything wrong. She told the jury that her mother raised her children to tell the truth. Miller asked the jury to spare Carruthers' life because he is innocent of these crimes. Carruthers took the stand on his own behalf. He told the jury he was innocent of the crimes and did not deserve to die.

## ANALYSIS

**Forfeiture of Right to Counsel**

In his first issue, Carruthers claims he was denied his right to due process when he was forced to represent himself during the trial of this capital case. The state argues in response that Carruthers forfeited his right to counsel. It is not disputed that Carruthers is indigent.

An indigent defendant has the constitutional right to appointed counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Northington, 667 S.W.2d 57 (Tenn. 1984). However, this right is not absolute, in that a defendant does not have the right to appointment of counsel of choice nor the right to a "meaningful relationship" with appointed counsel. See Morris v. Slappy, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983); United States v. Gallop, 838 F.2d 105, 107 (4th Cir.), cert. denied, 487 U.S. 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Moreover, appointed counsel is not required to blindly follow a defendant's instructions, see United States v. Padilla, 819 F.2d 952, 956 (10th Cir. 1987), and a defendant does not have the right to manipulate his right to counsel in order to delay or disrupt a trial, see United States v. White, 529 F.2d 1390, 1393 (8th Cir. 1976). "The right to assistance of counsel, cherished and fundamental though it may be, may not be put to service as a means of delaying or trifling with the court." United States v. Fowler,

605 F.2d 181, 183 (5th Cir. 1979), <u>cert</u>. <u>denied</u>, 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 785 (1980).

Similarly, a defendant may only request a substitution of appointed counsel for good cause shown. <u>See</u> <u>Gallop</u>, 838 F.2d at 108. Good cause may include a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with counsel, <u>see</u> <u>United States v. Goldberg</u>, 67 F.3d 1092 (3rd Cir. 1995), but does not include defendant's statements that counsel is unenthused about the case or is inadequately addressing the issues, <u>see</u>, <u>e.g.</u>, <u>United States v. Jennings</u>, 855 F.Supp. 1427, 1441 (M.D.Pa. 1994). Moreover, good cause "cannot be determined solely according to the subjective standard of what the defendant perceives." <u>Thomas v. Wainwright</u>, 767 F.2d 738 (11th Cir. 1985), <u>cert</u>. <u>denied</u>, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 345 (1986). The court may deny a request for substitution of counsel if the defendant's request "proceeds from a transparent plot to bring about delay." <u>Gallop</u>, 838 F.2d at 108 (citing <u>Morris v. Slappy</u>, 461 U.S. at 13, 103 S.Ct. at 1617); <u>see</u> <u>also</u> <u>United States v. Kelm</u>, 827 F.2d 1319, 1322 (9th Cir. 1987).

While the defendant is guaranteed the right to appointed counsel in criminal cases, this right may be waived. In order for a court to accept defendant's waiver of appointed counsel and allow him or her to proceed pro se, the court must find that the waiver is voluntary, knowing, and intelligent. <u>Faretta v. California</u>, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); <u>State v. Small</u>, 988 S.W.2d 671 (Tenn. 1999). This should include an explanation to the defendant about the inherent risks of proceeding pro se and a determination that the defendant is aware of the nature of the charges against him, as well as the possible penalties. <u>See</u> <u>Hendricks v. Zenon</u>, 993 F.2d 664, 670 (9th Cir. 1993); <u>Small</u>, 988 S.W.2d at 674. The appellant in this case did not voluntarily waive his right to counsel. Even after Massey and Sayle were allowed to withdraw, Carruthers continued to request appointment of counsel. Although we find that Carruthers did not waive his right to counsel, we do agree with the trial judge's conclusion that Carruthers forfeited his right to counsel.

37

Forfeiture of a right, as it has been defined by the federal courts, means "the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." United States v. Goldberg, 67 F.3d 1092 (3rd Cir. 1995). It is well-recognized that criminal defendants may forfeit certain fundamental constitutional rights. See, e.g., Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) (right to public trial); Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (right to be present at trial); United States v. Boscaro, 742 F.2d 1335, 1365 (11th Cir. 1984) (right to raise double jeopardy defense); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (right to confrontation). And while it appears the appellate courts of Tennessee have not yet addressed the specific issue currently before us, several of the federal courts have recognized that a defendant may also forfeit his constitutional right to counsel. See United States v. Goldberg, 67 F.3d 1092 (3rd Cir. 1995); United States v. McLeod, 53 F.3d 322 (11th Cir. 1995); United States v. Travers, 996 F.Supp. 6 (S.D.Fla. 1998). See also United States v. Meeks, 987 F.2d 575, 579 (9th Cir. 1993), cert. denied, 510 U.S. 919, 114 S.Ct. 314, 126 L.Ed.2d 261 (1993) (citing United States v. Kelm, 827 F.2d 1319 (9th Cir. 1987) and United States v. Leavitt, 608 F.2d 1290 (9th Cir. 1979) ("In limited circumstances, a court may force a defendant to proceed pro se if his conduct is "'dilatory and hinders the efficient administration of justice.'")); United States v. Fazzini, 871 F.2d 635, 642 (7th Cir. 1989), cert. denied, 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989) (quoting United States v. Moore, 706 F.2d 538, 540 (5th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983) ("a persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a knowing and voluntary waiver of counsel")).

Forfeiting the right to counsel is different than voluntarily waiving the right. It can also be distinguished from an implied waiver of the right after having been warned that self-representation may follow if the prohibitory conduct continues. See Goldberg, 67 F.3d at 1100. In the case of an implied waiver, the defendant has been cautioned against future conduct and has been informed of the consequences of his actions. In the case of forfeiture, there may have been no warnings given by

the court. In both cases, however, the defendant has not voluntarily waived counsel nor indicated that he wishes to proceed pro se.

In the case at hand, after denying Massey's motion to withdraw but prior to this Court's order on extraordinary appeal, the trial court, referring to some of the above-cited federal law, stated that Carruthers had two options remaining: either proceed to trial with the assistance of Massey and Sayle or proceed on his own. This statement would suggest that an implied waiver resulted. However, as to Massey, this Court allowed Massey to withdraw shortly after the trial court warned the appellant, and therefore, the result is more akin to a forfeiture since counsel was removed without any additional egregious conduct by Carruthers directed at Massey. Regarding Sayle, however, Carruthers did engage in additional egregious conduct resulting in Sayle's removal. Because the forfeiture of a constitutional right is the most severe sanction, the defendant's conduct leading up to the forfeiture must be extremely dilatory. Id. at 1101. The Goldberg court suggests that an implied waiver (waiver by conduct) could be based on conduct less severe. Id. We believe, however, that in either case, the forfeiture of counsel or the implied waiver of counsel, since the defendant is not voluntarily giving up one of his basic, fundamental constitutional rights, the defendant's conduct must be so extremely egregious and dilatory that the trial court has no other option but to force the defendant to proceed pro se. The sanction imposed should be appropriate under the circumstances and commensurate with the nature and extent of the defendant's conduct. Again, the assertion of the defendant's rights must be weighed against the effective and efficient administration of justice. See Leavitt, 608 F.2d at 1293. The courts cannot permit defendants to abuse their rights to the detriment of the system.

We have not been able to find any capital cases involving the forfeiture of the right to counsel. Cf. Waterhouse v. State, 596 So.2d 1008 (Fla. 1992) (defendant considered to have forfeited right to counsel during closing argument of resentencing hearing in capital case). And while we are cognizant of the heightened due process concerns in death penalty cases, we also recognize that courts cannot be handcuffed by the whims of the defendants. Although we are not bound by the

decisions of the lower federal courts, after carefully reviewing the record in this case, we are persuaded by the reasoning of these decisions concerning forfeiture of the right to counsel. "We believe that there must be some limit to the defendant's ability to manipulate the judicial system even if he is unknowing and unintelligent." Gallop, 838 F.2d at 110.

Carruthers' conduct regarding his relationship with Massey has been thoroughly outlined above. After Massey was removed from the case completely, the court allowed Sayle to remain as "elbow" counsel. The record indicates that the appellant wished to recant the accusations he made toward Massey. The court, however, said enough was enough. As noted above, Sayle was also finally allowed to withdraw completely from the case. Even after Carruthers lost the assistance of one of his two remaining attorneys, he still continued with his conduct toward Sayle. The court had warned Carruthers that he could either cooperate with Massey and Sayle or lose his right to counsel. Apparently, neither the removal of Massey nor the trial court's warning persuaded Carruthers. When Sayle finally moved the court to be allowed to quit as elbow counsel, he made the following statements:

> He has expressed the feeling that I am not working for him, and that I have not done anything for him, I'm not going to do anything for him. He suspects -- he's made it clear that he suspects that I'm working with the state in some capacity. And frankly none of the advice I give him is followed, and I don't think there is any intention of following it. And frankly it's just -- and the abuse gets extremely personal. Personal vilification over the last couple of meetings, and I see no basis for being able to continue.

The threats Carruthers made in his letters and calls to Massey clearly threatened physical violence. Comments about what type of car Massey's daughter drove and the ability to discover the color of Massey's toothbrush could be taken no other way. Carruthers also accused Massey of abusing drugs. The comments and accusations Carruthers made toward Craig Morton and Coleman Garrett, were much more personal. Though the threats of physical violence are not as apparent, we do not believe any attorney in Tennessee could work under the abhorrent conditions created by Carruthers. These letters were written in June and July of 1995. Garrett and Morton were relieved as counsel in late July 1995. These letters were in a

sealed exhibit in the record. They shall remain sealed, and out of respect to the attorneys involved, we will not reveal the nature of the comments which these attorneys could rightfully consider outrageous.

We have previously quoted extensively from the numerous pretrial hearings. During the hearing on Garrett and Morton's motion to withdraw, the trial judge referred to the outrageous accusations Carruthers made against his attorneys. However, the judge did not recite anything specific from these letters. Nor will we, except to say that no attorney should have to tolerate the hostile and uncomfortable atmosphere created by Carruthers. The letters to Garrett and Morton indicate that Carruthers' conduct was not limited to his relationship with Massey. There is simply no evidence in the record to support any of Carruthers' accusations. This Court found on extraordinary appeal that Massey was entitled to withdraw. This was at least the fifth attorney appointed to represent Carruthers who was allowed to withdraw because of the hostile environment created by Carruthers. Sayle subsequently was allowed to withdraw for similar reasons. We do not believe this history of abuse would have ceased if yet another set of attorneys were appointed.

In fact, the history predates this case. The trial judge noted that in a previous case, Carruthers had gone through four sets of attorneys. In this respect, we take notice of the fact that the defendant was convicted of aggravated assault in 1990 in a case in which he was appointed four successive attorneys due to his continuing dis-satisfaction with counsel. The last attorney was appointed less than a month before trial and was the object of the defendant's unsuccessful post-conviction claim of ineffective assistance of counsel. See Tony V. Carruthers v. State, 02C01-9505-CR-00130, Shelby County (Tenn. Crim. App. Apr. 17, 1996).

As noted above, a criminal defendant does not have the right to a meaningful relationship with his counsel, nor the right to choose which counsel shall be appointed. See Morris v. Slappy, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983); United States v. Gallop, 838 F.2d 105, 107 (4th Cir.), cert.

41

denied, 487 U.S. 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Furthermore, counsel is not required to blindly follow the defendant's instructions. See United States v. Padilla, 819 F.2d 952, 956 (10th Cir. 1987). Counsel, whether appointed or not, are trained and licensed professionals who are required to abide by certain standards in the performance of their duties. Similarly, the defendant does have the absolute right to make certain choices during his trial. Counsel, however, cannot simply acquiesce to every single demand or request of the defendant which does not affect the exercise of certain absolute rights. The Post-Conviction Procedure Act was created to address any of the defendant's concerns about counsel's representation.

Given the history of this case, which has been thoroughly summarized above, it is clear to us that Carruthers would not have been satisfied with any attorney and was simply trying to manipulate the system. Even after the court appointed counsel for the motion for new trial and appeal, Carruthers wrote several letters to the trial judge insisting that his new attorneys were incompetent. We do not believe the trial court interfered with the exercise of Carruthers' constitutional rights. After considerable time and consideration, the trial court properly weighed the effective and efficient administration of justice against Carruthers' right to counsel. As the trial court observed, Carruthers was the author of his own predicament. Again, there has to be a point when the courts are permitted to stop the abuse and delay tactics employed by a criminal defendant under the guise of his or her constitutional rights.

We do not take lightly the result that a defendant has to proceed pro se in any trial, especially one involving a capital offense. Our judicial system could not survive if those accused of crimes were literally run over "roughshod." But while the individual must be protected by the system, the judicial system must also be protected from abuses by an individual. A person charged with criminal acts cannot be allowed to subvert the judicial system. Appellant Carruthers was, in effect, given one last chance for assistance of counsel after Massey was allowed to withdraw; Sayle remained as "elbow" counsel for a period of time until he, too, was allowed to withdraw due to Carruthers' conduct. The removal of Sayle came after Carruthers

was clearly warned by the trial court that his conduct could result in him being required to proceed pro se at trial. A reversal of a conviction and a remand for a new trial is done with the appellate court having confidence that the new trial will correct the previous error. We concur with the trial court's judgment in this case that no matter how many times Carruthers might be allowed to have counsel, he would continue his egregious conduct to force counsel off the case until ultimately, again, he would have to proceed pro se. Carruthers is not entitled to relief on this issue.

The appellant also claims that because he was forced to represent himself the trial judge did not treat him fairly or in the same manner as an attorney. Carruthers argues this was prejudicial error requiring a new trial. Having reviewed each of the numerous instances cited by appellant on appeal in this respect, we do not believe the trial court denied the appellant a fair and impartial trial. When this Court allowed Massey off the case, Carruthers expressed his concerns to the trial judge about proceeding pro se. The judge stated that this was unfortunate but reminded Carruthers that he placed himself in this position. The Court assigned Massey and Sayle as elbow counsel and informed the appellant that they would provide assistance and advice during trial. Shortly thereafter, however, this Court ruled that Massey was to be completely removed from any involvement in this case. Carruthers again asked for appointment of new counsel, but the judge denied this and stated that Sayle would remain to assist. Even at this point, when the appellant had expressed concerns about proceeding to trial without counsel, he still persisted with his antics which eventually led to the removal of Sayle from service as elbow counsel.

While a pro se litigant is not held to the same strict standards as a practicing attorney, see, e.g., Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), because he is proceeding without the assistance of counsel does not mean the court must completely ignore the procedural and substantive rules of law. "This Court does bend over backwards with pro se litigants to make sure they are treated fairly. However, we cannot bend the rules until they break. Otherwise, our system lacks consistency and honesty." State v. Allen, No. 01C01-9510-CC-00338 (Tenn. Crim. App., Oct. 29, 1996), perm. to app. denied, (Tenn., May 12, 1997). The appellant must realize that although he was conducting his own defense, given the nature of the charges against him he remained in protective custody and was bound by certain limitations not endured by an attorney. These limitations would necessarily be more evident when there were heightened security concerns in a case such as this. Accordingly, because of these

limitations inherent in his status as a pro se litigant, Carruthers certainly could not exercise all of the privileges of an attorney not confined in a jail cell.

Carruthers enjoyed the services of a jury selection expert and an investigator who could assist in any matters Carruthers could not accomplish from the confines of his cell. The appointment of an investigator, however, was not a substitution for counsel. Carruthers remained a pro se litigant. Immediately prior to the start of trial in April, after a continuance from January, Carruthers requested additional time in order to retain counsel. The trial court denied any further continuances. Contrary to the appellant's claim that he was denied sufficient time, we agree with the trial judge that this was another in a long line of delay tactics by Carruthers. Furthermore, because Carruthers had the files from his previous attorneys, and because the trial was continued three months after he began to represent himself, there is nothing in the record to suggest that Carruthers did not have ample opportunity to prepare his case.

> One of the most fundamental responsibilities of a trial court in a criminal case is to assure that a fair trial is conducted. See, e.g., State v. Burkhart, [541 S.W.2d 365, 371 (Tenn. 1976)]. Generally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve this primary purpose, and absent some abuse of the trial court's discretion in marshaling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried.

State v. Franklin, 714 S.W.2d 252, 258 (Tenn. 1986).

Again, there are certain perils a defendant may encounter when he represents himself in a criminal trial. Obviously, the better practice would be to proceed with counsel. But as in this case, where the defendant consistently abused his right to counsel and had to proceed pro se, the pro se defendant will not necessarily perform as well as an experienced attorney and may invariably make certain mistakes. However, this alone is not cause for a new trial. As long as the judge ensures that a fair and impartial trial is conducted, the mistakes and ill-advised strategy decisions are merely byproducts of self-representation. We have carefully reviewed each of appellant's assignments of error during trial. The trial judge in this case was extremely understanding and forgiving. This is not to say that the trial judge allowed Carruthers to conduct his defense without regard for maintaining orderly proceedings. While the judge was more lenient in the application of the rules of law, he did not, nor was he required to, allow Carruthers free reign in the courtroom. Having completely reviewed the record in light of all of Carruthers' claims in this respect, we find that the appellant was afforded a fair and impartial trial. A new trial is not required.

44

Carruthers claims that he was denied the effective assistance of counsel. While a criminal defendant has the right to the effective assistance of counsel, see Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), when the defendant waives or forfeits his right to counsel, he also waives or forfeits his right to the effective assistance of counsel, see State v. Goodwin, 909 S.W.2d 35, 45 (Tenn. Crim. App. 1995). This claim is without merit.

**Consolidation of Indictments**

Appellant Carruthers claims the trial court erred by not requiring the state to elect upon which indictments it intended to proceed upon at trial. In March 1994, both appellants were originally indicted on three counts of first degree murder. Subsequently, in November 1995, both appellants were indicted on three counts of especially aggravated kidnapping and one count of especially aggravated robbery. All of these offenses arose from the same criminal episode and involved the same three victims. The trial date in this matter was originally scheduled for February 1995, prior to the return of the second set of indictments. However, due mainly to Carruthers' conduct regarding counsel, the trial was eventually continued several times until the Spring of 1996.

Carruthers contends that the murder indictments should have been dismissed. Because the state was not forced to elect between the two indictments, according to the appellant's argument, he "could not reasonably have known whether he was defending murder charges or charges of kidnapping and robbery." The appellant further claims that if the trial court had followed "normal procedure," he would have never been tried on the murder charges. The state disagrees and asserts that the appellant was properly tried on all charges.

Tenn.R.Crim.P. 8(a) (emphasis added) regarding mandatory joinder of offenses provides:

> Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall

45

not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

The Advisory Commission Comments to Rule 8 further provide, in pertinent part:

This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. Where such joinder of offenses might give rise to an injustice, Rule 14(b)(2) allows the trial court to relax the rule.

The Commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of "saving back" one or more charges arising from the same conduct or from the same criminal episode. Such other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury.

Carruthers' argument ignores the basic premise behind the Rule. The purpose of Rule 8 is to promote efficient administration of justice and to protect the rights of the accused. The rule clearly permits a subsequently returned indictment to be joined with a previous indictment where the alleged offenses relate to the same criminal episode. See King v. State, 717 S.W.2d 306 (Tenn. Crim. App. 1986). This practice, however, does have certain limitations which, as the comments note, safeguard an accused against prosecutorial abuse. For example, a prosecutor cannot simply decide to "save" charges on other offenses arising out of the same conduct until after a trial is had on the original charges. Obviously, this would result in multiple trials and prejudice the defendant. This concern, however, is not present in the case at hand because the subsequent indictments were returned well before the start of trial.

Although there is no written trial court order consolidating the indictments in this case, not only was consolidation mandated by the rules, it was clearly understood by the court and all parties involved in this case. As soon as the 1995 indictments were returned, the appellants filed a motion to dismiss. After a hearing on December 19, 1995, the trial court denied the motion, and the matter proceeded on all charges. In fact, counsel admitted that they knew they were going to trial on the murder charges; they moved to dismiss the new charges. Carruthers' claim that he did not know what charges the state was prosecuting is wholly without merit. Not

only did the appellant file a motion to dismiss the subsequent charges, which was denied, the style of the pleadings and orders filed in this case after the return of the 1995 indictments, including letters Carruthers wrote to his attorney, refer to both the 1994 and 1995 indictments. Moreover, jury selection had already started in early January 1996, when the state moved for a continuance. There certainly was no confusion as to charges being tried when a jury was again selected and trial finally began three months later in April 1996. All of the indictments were read to the jury at the beginning of the trial.

As this Court observed in King,

> We do not perceive that any evil results from subsequent indictments being returned against a defendant charging him with additional offenses which are based on the same conduct or which arise from the same criminal episode upon which prior indictments have been returned; when the defendant has not been tried on any of the offenses at the time the subsequent indictments are returned. As previously noted, the purpose of Rule 8 is to prevent multiple trials on charges arising from the same conduct or from the same criminal episode except under the circumstances stated in the rule.

717 S.W.2d at 308. To follow the appellant's suggestion in this case would result in the non-prosecution of three murder charges. Surely this type of windfall was not contemplated by the drafters of the Rules. The appellant has simply failed to show how he was unprepared to defend on kidnapping and robbery charges that stemmed from the same criminal episode in which three individuals were killed.

**Grand Jury Proceedings**

Carruthers also claims that the murder indictments should have been dismissed because of "the admittedly questionable testimony presented to the grand jury in support" of them. According to Carruthers, the bad faith of the prosecutor by refusing to call Alfredo Shaw as a witness at trial, despite having relied upon his testimony to secure the murder indictments, necessarily implies that the grand jury process was corrupted. The state denies that the murder indictments are invalid. The appellant also claims he should have been entitled to the transcript of these grand jury proceedings.

As noted above, Alfredo Shaw testified before the grand jury about the circumstances of the murders related to him by Carruthers in jail. The state, however, indicated that it did not intend to call Shaw as a witness during trial because they had some concerns about his credibility due to criminal conduct after the grand jury testimony. Despite this, Carruthers himself called Shaw as a witness and Shaw conveyed to the jury the same information he reportedly told the grand jury. Shaw testified that he previously attempted to recant his grand jury testimony, but informed the jury this was because his and his family's safety was threatened by Carruthers. Accordingly, the "admittedly questionable testimony" the appellant complains about was explained away.

Nevertheless, the appellant's claim must fail. It has long been the rule of law that the sufficiency and legality of the evidence presented to a grand jury is not subject to judicial review. State v. Gonzales, 638 S.W.2d 841, 845 (Tenn. Crim. App. 1982); State v. Northcutt, 568 S.W.2d 636, 639 (Tenn. Crim. App. 1978). "[I]f an indictment is valid on its face, it is sufficient to require a trial to determine the guilt of the accused regardless of the sufficiency and/or antecedence of the evidence considered by the grand jury." State v. Dixon, 880 S.W.2d 696, 700 (Tenn. Crim. App. 1992). Accordingly, the appellant cannot rely on this claim to challenge the validity of the murder indictments. See United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As the cases indicate, the proper remedy for the appellant is through a motion to suppress the evidence. See e.g. State v. Culbreath and McCallie, No. 02C01-9805-CR-00145 (Tenn. Crim. App., Mar. 9, 1999) (Rule 11 application pending) (citing United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, L.Ed.2d 510 (1966)). Here, the evidence the appellant complains about would never have been presented to the trial jury if Carruthers himself did not call Shaw to the witness stand. This issue is without merit. Also without merit is the appellant's claim that he should have been provided a transcript of the grand jury proceeding in this instance. See Rules 16(a)(3) and 6(k), Tenn.R.Crim.P. See also West v. State, 466 S.W.2d 524, 525 (Tenn. Crim. App. 1971).

**Letters from Carruthers to Maze**

48

Next, Carruthers claims that the trial court erroneously allowed into evidence two letters the appellant wrote to Jimmy Maze. In these letters, Carruthers refers to a master plan for making money. The state alleged that this plan involved the murder of Marcellos Anderson and the theft of his drugs and money. The appellant argues that the letters are too vague, have no evidentiary value, and are highly prejudicial.

The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse. See State v. Howard, 926 S.W.2d 579, 585 (Tenn. Crim. App. 1996),overruled on other grounds, State v. Williams, 977 S.W.2d 101 (Tenn. 1998). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Tenn.R.Evid. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403. Of course, simply because evidence is prejudicial does not mean the evidence must be excluded as a matter of law. See State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993), perm. to app. denied, (Tenn. 1994). The Court must still determine the relevance of the evidence and weigh its probative value against any undue prejudice.

The appellant argues that the letters are irrelevant because they were written too far in advance of the actual murders and do not refer to the victims or mention how the money would be made. He also suggests that the letters are improper evidence of other crimes or wrongdoings. After a jury-out hearing as to whether these letters should be admitted, the trial court made the following findings:

> But the proof itself, I think, goes directly toward establishing this one additional link, one additional factor in establishing, from the State's perspective, the existence of a conspiracy. It's very relevant, in my judgment.
>
> It talks about a master plan. It talks about having the support personnel lined up. It talks about having the manpower lined up. It talks about "joining with me" and getting with the program, in effect, and

"get with me when I get out." And it makes reference to the fact that he is trying to get transferred to MLRC, Mark Luttrell Reception Center, which then ties in to the testimony that Charles Smith gave, which would -- of having overheard some conversations along these line [sic] as well.

You know, again, the jury may not believe any of it, and that's up to the jury. Or they may believe it all. But it all ties in, and it all ties together. The letters tie in with what Mr. Smith testified to.

. . .

And again, this is additionally why these matters need to be heard during the trial and not pretrial, because I now have the benefit of having heard Charles Smith's testimony and having heard other testimony now that Mr. Maze is now on the stand, and I can better judge how his testimony fits in with all of the other testimony.

The trial judge clearly explained how these letters were relevant to the issues being tried, and having reviewed the transcript of the jury-out hearing, we are satisfied that the judge did not abuse his discretion in admitting these letters into evidence. Their probative value substantially outweighed any prejudicial effect. This issue is without merit.

**Statement of Co-Conspirator**

Next, Carruthers claims that the testimony of Hines relating what Jonathan Montgomery told him was inadmissable hearsay. The state counters by arguing these statements were admissible under the co-conspirator exception to the hearsay rule. See Tenn.R.Evid. 803(1.2)(E).

Hearsay, which is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Rule 801(c), is not admissible at trial except as provided by the Rules of Evidence or otherwise by law. Rule 802. A statement made by a coconspirator of the defendant "during the course of and in furtherance of the conspiracy" is one of the exceptions to the hearsay rule. Rule 803(1.2)(E). However, before this type of hearsay may be admitted, certain conditions must be met: 1) there must be evidence of a conspiracy involving the defendant and coconspirator; 2) the statement must be made during the pendency of the conspiracy; and 3) the statement must be made in the furtherance of the conspiracy. State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992).

On the night of the murders in this case, Jonathan Montgomery told Chris Hines that they "got them folks out at the cemetery" and asked Hines to take him to the cemetery. Hines refused but allowed Montgomery to borrow his car. The next morning, when the three defendants took Hines to get his car washed, Jonathan Montgomery again told Hines they killed some people. The appellant argues that the conspiracy in this case ended with the murders, and that these statements were not during the course of and in furtherance of the conspiracy. The state disagrees. In its brief, the state argues the first statement by Montgomery was made during the course of the conspiracy because he was seeking a vehicle in which to transport the victims to the cemetery. The second statement, the state argues, was made during the concealment of the conspiracy, and thus admissible under the same hearsay exception.

In State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995), a case wherein several defendants conspired to rob the victim, who was ultimately killed during the robbery, our Supreme Court held that a statement by a coconspirator made three or four days after the robbery and murder was inadmissible because the conspiracy ended with the commission of the robbery. The Court found that the statement merely related the circumstances of the robbery and killing and were not made during a further conspiracy to conceal the circumstances of the crime. Id. It would follow then that if there is evidence of a further conspiracy after the fact to conceal the crime, any statement by a coconspirator made during the course of and in furtherance of this further conspiracy may be admissible against the defendant. Id.; see also State v. Henry, No. 01C01-9505-CR-00161 (Tenn. Crim. App., Feb. 25, 1999) (Rule 11 pending).

In Henry, we noted that a conspiracy to commit a crime did not historically extend to steps taken to conceal the crime unless proof established that concealment furthered the objectives of the crime. Id. (citing Gaylor, 862 S.W.2d at 554 (where conspiracy to commit murder did not end until victim's insurance proceeds were collected)). We also noted that the Supreme Court in Walker did not explore the relationship, if any, between the Rules of Evidence and T.C.A. § 39-12-

51

103, the conspiracy statute, which provides that the conspiracy includes efforts to conceal the crime or to obstruct justice in relation to it. The Court suggested that the coconspirator exception to the hearsay rule should be examined under the law as it existed prior to the enactment of the conspiracy statute because of subsection (g) of that statute, which provides that "[n]othing in this provision is intended to modify the evidentiary rules allowing statements of co-conspirators in furtherance of a conspiracy." However, there may be some relationship between the Rules of Evidence and the criminal statute if the defendant is specifically charged with conspiracy, which is not the case here. See Henry.

The question in this case then becomes whether the statements made by Jonathan Montgomery were made either when the defendants were concealing the murders to achieve the objectives of the crimes or during a further conspiracy to conceal the murders. To fall under this hearsay exception, the statements by the coconspirator must advance in some way the objectives of the conspiracy and not simply be "casual conversation" about the crimes. State v. Hutchinson, 898 S.W.2d 161, 170 (Tenn. 1994).

We agree with the state that Montgomery's first statement to Hines falls under this hearsay exception. Harris' Jeep was found burned in Mississippi. The victims were buried alive in a cemetery in Memphis. Trial testimony indicated that it would have taken approximately two people to remove the plywood vault that lined the grave site under which the victims were buried. The jury could reasonably have inferred that when Jonathan Montgomery asked Hines to take him to the cemetery, the victims had not yet been buried and Jonathan was needed to assist the other two defendants. Moreover, the jury could have reasonably inferred since Hines' car was muddy when returned that it was taken to the cemetery. The testimony and videotape reveal that the cemetery grounds did contain muddy areas. Since Jonathan was needed to complete the robbery, kidnappings and murders, his statement to Hines that he killed some folks and needed a ride to the cemetery advanced the conspiracy and was not merely a narrative statement to Hines. While we find that the statement was admissible, we do not agree with the particular

52

argument the state advances in support thereof. Montgomery told Hines, "Man, we got them folks out at the cemetery." Since the victims were allegedly already at the cemetery, we cannot agree with the state that the car was needed to transport the victims there.

Jonathan Montgomery's next statement allegedly came after the bodies were buried. The state argues that this statement was made during the concealment of the conspiracy. Whether or not the concealment of the crimes furthered the objectives of the original conspiracy, there was certainly evidence of a <u>further</u> conspiracy to conceal the commission of the crimes. Montgomery could have been connected to Hines' car and the mud from Hines' car could have been traced to the cemetery where the victims were discovered. The question, however, is whether the second statement furthered in some way the objectives of the conspiracy or was merely a narrative statement of past conduct. Apparently, while Montgomery and Hines were standing around waiting for the car wash, Montgomery told Hines they killed some people. We do not believe Montgomery made this statement during or in furtherance of the conspiracy to conceal evidence of the crimes. It is more akin to "casual conversation" about past events and should not have been admitted. Because Jonathan Montgomery's first statement was admissible, we find, however, that the erroneous admission of the second statement was harmless. The content of the second statement mirrored that of the first.

Carruthers also claims that he should have been allowed to question Detective Ruby about the content of Jonathan Montgomery's statements to the police. The state argues that this hearsay testimony was properly excluded. In <u>State v. Walker</u>, 910 S.W.2d 381, 386 (Tenn. 1995), the Supreme Court held that a conspirator's "statement to the police can hardly be in furtherance of the conspiracy. It becomes only a narrative statement of past conduct between the conspirators." The Court noted, however, that a confession to the police may fall under another exception to the hearsay rule, such as a statement against penal interest when the declarant is unavailable. <u>Id.</u> at 385.

In this case, Jonathan Montgomery gave several varying statements to the police. At first, he denied knowing anything about the crimes or being present at the scene. These statements would not fall under this exception to the hearsay rule. In subsequent statements, he stated that he, the two appellants, and Bobby Wilson, a fourth person not identified by any of the witnesses at trial, were all at the scene of the crime. In one statement, he said Bobby Wilson shot one of the victims but he did not know who shot the other (only two of the three victims were shot). Yet, he informed the police in another statement that Carruthers and/or Montgomery shot the victims. Since Jonathan Montgomery placed himself at the scene of the murders, these later statements do appear to fall under this exception to the hearsay rule. Tenn.R.Evid. 804(b)(3). However, we find the erroneous exclusion of this testimony to be harmless. See T.R.A.P. 36(b). The statements clearly implicate Carruthers and would have done more harm to his case.

**Evidence of Other Perpetrators**

Both appellants argue the trial court limited their ability to establish that other people involved in the Memphis drug trade had motives to kill the victims in this case. Again, the admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse. See State v. Howard, 926 S.W.2d 579, 585 (Tenn. Crim. App. 1996). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Tenn.R.Evid. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403.

As is commonly recognized, an accused is entitled to present evidence implicating others in the crime. See Green v. State, 285 S.W. 554 (1926); Sawyers v. State, 83 Tenn. 694 (1885); State v. Spurlock, 874 S.W.2d 602, 612-13 (Tenn. Crim. App. 1993). Evidence in support of this third party defense, however, must conform to the general rules governing the admissibility of evidence. State v.

54

McAlister, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987). The evidence must be the type that would be admissible against the third party if he or she were on trial, and the proof must be limited to facts inconsistent with the appellant's guilt. State v. Kilburn, 782 S.W.2d 199, 204-05 (Tenn. Crim. App. 1989). Accordingly, hearsay evidence implicating another individual would not be admissible.

Having reviewed the record in light of the appellants' claims, we find that the trial court did not exclude any relevant admissible evidence tending to implicate others in the murders while exonerating the appellants. The jury was well aware that Marcellos Anderson was heavily involved in the drug trade in Memphis. The jury heard evidence about Anderson's drug dealings with Johnson and Adair. The jury heard that Anderson and Adair had previously been shot by others in drive-by shootings. They heard that Andre Tucker, the brother of one of the victims in this case, was subsequently killed after the appellants had been arrested on the present charges. As the state notes, this evidence clearly suggests that the killings in the drug world were still happening. The evidence the appellants refer to was either hearsay (testimony that Anderson was in debt to Colombian drug dealers) or cumulative and would have confused the issues and misled the jury (attacks on others involved in the Memphis drug trade). Again, the jury knew this case centered around activities in the drug world and they could reasonably have used their common knowledge to conclude that there were many players involved. The evidence in this case, however, pointed to the guilt of the appellants. This issue is without merit.

**Competency of Witness Nakeita Shaw**

Carruthers next claims that the trial court erred by not ordering a competency evaluation of Nakeita Shaw. Prior to trial, counsel representing Carruthers at the time requested an evaluation of Shaw and any records of a history of mental treatment. The state indicated that it had no record of treatment. The trial court denied the request. During the first jury selection, the state asked for a trial continuance because Shaw had checked herself into a hospital for depression and could not appear in court. The court granted the continuance. Carruthers claims,

55

however, that this fact should have been a compelling enough reason for the trial court to exercise its inherent power to order a competency evaluation.

In support of his claim, Carruthers relies upon State v. Garland, 617 S.W.2d 176 (Tenn. Crim. App. 1981). Carruthers' reliance is misplaced. In Garland, this Court specifically held "[t]here is no statutory or case law in Tennessee authorizing a court to compel a prospective witness, not a party interested in the case and present only by compulsion of a subpoena, to submit to a psychiatric examination." Id. at 185. The Court further held that the ruling in Forbes v. State, 559 S.W.2d 318 (Tenn. 1977), that the trial court has the inherent power to compel a psychiatric or psychological examination of the victim, was restricted to complaining victims in sex cases. The Court refused to broaden this holding, and neither of the parties in the case before us have cited to any authority which has done so. The case cited by the appellant involves the physical examination of a complainant in a sex case. State v. Barone, 852 S.W.2d 216 (Tenn. 1993). It clearly appears that the court ordered examination of witnesses has been limited to complainants in sex cases, and we do not intend to broaden the holding in Forbes any further.

Tenn.R.Evid. 601 provides that every person is presumed competent to be a witness. The Advisory Commission Comments to this rule state that "[v]irtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." (Emphasis added). Accordingly, any prospective witness may testify as long as they have personal knowledge of the matter about which they are testifying, Rule 602, and swear they will testify truthfully, Rule 603. The trial judge has the discretion to determine whether a witness is competent to testify. State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993). This determination will not be disturbed on appeal absent an abuse of discretion. State v. Howard, 926 S.W.2d 579, 584 (Tenn. Crim. App. 1996) (overruled on other grounds). In Garland, this Court held:

> A lunatic or a person adjudged insane is competent as a witness if, at the time he is offered as a witness, he has sufficient understanding to comprehend the obligation of an oath and capable of giving a correct

account of the matters which he has seen or heard in reference to the questions at issue.

617 S.W.2d at 184.

Despite the above-cited authority, the state claims Carruthers has waived this issue 1) by not renewing his request for a mental examination of Shaw before she took the witness stand and 2) by failing to question her on cross-examination about her hospitalization. See T.R.A.P. 36(a). We agree. Since the trial court did not have the authority to order a mental evaluation of Shaw, and because Carruthers failed to preserve the issue, this matter has been waived. Regardless, even if Shaw had been found to be mentally incompetent, she could have testified as long as she was able to understand the obligation of an oath and had personal knowledge of the matter to which she testified. See Caughron, 855 S.W.2d at 538. The trial judge apparently determined that she was competent according to the law to testify, and there is nothing in the record to suggest he abused his discretion. This issue is without merit.

**Photographic Evidence**

Both appellants claim that the videotape and photographic evidence of the crime scene and deceased victims were irrelevant, cumulative, highly prejudicial and erroneously admitted to inflame the passion of the jury. They claim this evidence did not assist the jury in identifying the perpetrators and was cumulative of the oral testimony of the witnesses. Furthermore, the appellants argue the evidence should not have been shown to the jury because the appellants offered to stipulate to the fact that the victims were found bound in the grave site.

The admissibility of relevant photographs and videotapes of the crime scene and victims is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). See also, State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). Moreover, the modern trend is to vest more discretion in the trial

judge's rulings on admissibility.  See Banks, 564 S.W.2d at 949; State v. Bailey, 01C01-9403-CC-00105 (Tenn. Crim. App., Nashville, July 20, 1995); perm. to app. denied, (Tenn. Jan. 8, 1996).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Tenn.R.Evid. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403. Of course, simply because evidence is prejudicial does not mean the evidence must be excluded as a matter of law. See State v. Gentry, 881 S.W.2d 1, 6 (Tenn.. Crim. App. 1993). The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Along these lines, the trial court should be guided by the following matters in determining the admissibility of relevant videotape and photographic evidence: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. Banks, 564 S.W.2d at 951.

Contrary to the assertion of the appellants, the identity of the perpetrators was not the only issue in this case. The state also had to prove to the jury the existence of the elements of all the offenses. The video shows the location of the grave site and the efforts to conceal the presence of the bodies. The trial court limited the number of still photographs, but allowed in several to show the restraints on the victims. As the state observes, the trial judge in this case was very conscientious in his review of the admission of the photographic evidence. The evidence was relevant to the state's case and assisted the jury in its finding that the state proved each element of the offenses. We do not find that the evidence was cumulative or unduly prejudicial. Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein, especially when the prosecution does not agree to the stipulation. See State v.

Schafer, 973 S.W.2d 269, 274-75 (Tenn. Crim. App. 1997); State v. Griffis, 964 S.W.2d 577, 595 (Tenn. Crim. App. 1997) ("an accused cannot marshal the evidence of the state by simply offering to stipulate to a fact for the purpose of barring the state from introducing admissible, demonstrative evidence the accused does not want the jury to see"). The trial court did not abuse its discretion in this case, therefore, this issue is without merit.

Montgomery also challenges the introduction of photographs of the victims before they were murdered. The appellant cites State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981). However, in State v. Nesbit, 978 S.W.2d 872, 901-02 (Tenn. 1998), the Supreme Court adopted that portion of this Court's opinion which held that a photograph of the victim while alive was relevant to the state's case-in-chief in proving that the person murdered was the same person named in the indictment. We find this evidence was not cumulative and was properly admitted.

**Sentencing on Non-capital Offenses**

Carruthers next contends that he was denied his right to be present at the sentencing hearing on the robbery and kidnapping convictions and he, therefore, requests a new sentencing hearing. The state claims he waived his right.

The trial judge originally scheduled the non-capital sentencing hearing for May 20, 1996. However, because of some confusion regarding transportation, the appellants were not brought to Memphis from the Riverbend Maximum Security Facility outside of Nashville. At this point, the court had already appointed counsel to represent Carruthers at the hearing on the motion for new trial and on appeal. The court reset the sentencing hearing for May 28, and informed counsel for both appellants of this continuance. On May 28, the court decided, because of security concerns, that the sentencing hearing would be held at Riverbend the next day. The court again informed Carruthers' counsel of this change, and stated that although they could appear, they would not have an active role in the hearing. The record does not reflect, however, whether the appellants were personally notified.

On May 29, the trial judge, along with the prosecutors and counsel for Montgomery, appeared at Riverbend for the hearing. Just prior to the start of proceedings, the warden informed the judge that Carruthers said he was not going to participate. The appellants were apparently located in a different area of the prison than where the hearing took place. Counsel for Montgomery also informed the judge that Montgomery was surprised the hearing was going to take place and that he, too, was not going to participate. Counsel stated that Montgomery was not going to participate because of the presence of the media. The judge, however, refused to exclude the media from the proceeding. The judge again asked the warden to inquire whether Carruthers wanted to be present. Carruthers, however, gave no reason other than to say he was not going to participate. The judge then decided he was going to proceed without the presence of either appellant since they had voluntarily elected to remain away. The judge stated that the appellants knew this hearing was going to take place, however, he admitted they may have been surprised about its location.

T.C.A. § 16-1-105 (1998 supp.) provides that

> If for any cause, in the opinion of the court deemed sufficient, it is impracticable or inconvenient for any court to hold its session at the courthouse, or place designated by law, it shall be lawful for the court to hold its session, or any part of its session, at any other room within the limits of the county seat, or at any other room open to the public within an institution of the department of correction or the department of children's services if the court deems it necessary, and all its proceedings at such place, whether in civil or criminal cases, are as valid as if done at the courthouse.

The trial court determined that it was necessary for security reasons to hold the sentencing hearing on the non-capital offenses at the prison outside Nashville. The room used in the prison was open to the public, as the media was there, and there appears to be no error in the trial court's judgment in this respect.

Criminal defendants have the right to be present at all stages of the trial, including sentencing. Tenn.R.Crim.P. 43(a). See also State v. Muse, 967 S.W.2d 764, 766-67 (Tenn. 1998). This right, however, may be waived. Rule 43(b); Muse, 967 S.W.2d at 767-68 (citing State v. Kirk, 699 S.W.2d 814 (Tenn. Crim. App.

1985)). "An accused who has notice of the time and place of the trial and of his right to attend, and who nonetheless voluntarily absents himself, will be deemed to have waived his right to be present." Kirk, 699 S.W.2d at 819. Rule 43 also provides that a defendant can waive his right to appear if, after present initially, he "[v]oluntarily is absent after the trial has commenced."

In Muse, a case discussing whether or not a defendant may waive the right to be present during jury voir dire, our Supreme Court acknowledged that there is a long-standing presumption against the waiver of fundamental constitutional rights. 967 S.W.2d at 767. The Court held that waiver would not be presumed from a silent record, and that in order for a defendant to waive his or her right to be present during voir dire, the defendant must personally waive the right in writing or on the record in open court. Id. at 768. In Muse, the trial court rescheduled the jury selection at counsel's request, but the defendant was personally unaware of this. When jury selection began a day earlier than originally scheduled, the defendant did not appear. The Supreme Court remanded for a new trial because the defendant was not informed of the rescheduling.

In this case, the trial judge admitted Carruthers may not have known that the court planned on visiting the prison. However, the judge stated that both appellants were aware that a sentencing hearing was going to occur. In fact, the hearing had originally been scheduled the week prior in Memphis. The judge also made the following comments for the record:

> Obviously, since there has already been a thorough sentencing hearing back in April, on April 26th, at the time that Mr. Montgomery and Mr. Carruthers were found guilty by the jury on the murder charges, the -- all three sides in the case, the state and both defendants, had an opportunity to present any and all proof they cared to at that time, with regard to sentencing issues. . . . And so I would assume that all three parties involved at that sentencing hearing would have presented any and all relevant proof that they had available to them at that time with regard to sentencing issues in this case.
> . . .
> Now, on Mr. Carruthers' behalf, since he's not represented by counsel, it had been my intention to address him in court today to see if there was any additional proof that he wanted, that he perhaps was missing out on since the matter was being held here. Since he has not graced us with his presence, I haven't had the opportunity to address him today.

After making the latter comments, the judge took a short recess to allow counsel to confer with Montgomery and to allow the warden to inform Carruthers that this was his opportunity to make a statement on his own behalf, if he so chose. Counsel for Montgomery returned from their conference and again informed the judge that Montgomery was objecting to this hearing because it was not being held in a public place. Counsel specifically stated that, to their knowledge, they would not have called any additional witnesses at this hearing. The warden once again informed the judge that Carruthers declined to participate. The warden made at least three attempts during the hearing to secure Carruthers' presence.

Given that there had previously been an exhaustive sentencing hearing in this case, the trial judge stated that he did not believe there would be any additional evidence presented by defense that would not have been cumulative. Of course, as provided by the Criminal Sentencing Reform Act of 1989, both the state and the defendant have the right to present relevant evidence at the sentencing hearing. See T.C.A. §§ 40-35-203(a); 40-35-209(b). This includes the opportunity for the defendant to make a statement on his own behalf. § 40-35-210(b)(6). Cf. State v. Stephenson, 878 S.W.2d 530, 550-52 (Tenn. 1994) (capital defendant not allowed allocution during capital sentencing hearing). The trial court, however, would have been permitted to exclude any evidence that had already been presented earlier in the proceedings. § 40-35-209(b). Similarly, in imposing the sentences for the kidnapping and robbery convictions, the judge was required to consider anything already in the record from the trial to date, including evidence from the capital sentencing hearing. § 40-35-210.

Counsel for Montgomery indicated they were not aware of any additional witnesses. And while the judge thought it was highly unlikely Carruthers would produce any, the judge was willing to allow Carruthers the opportunity to present any additional proof as well as make a statement on his own behalf. The record is silent as to whether Carruthers possessed any additional proof. If Carruthers had appeared at the hearing and requested a continuance so that he could forewarn any relevant witnesses they would need to travel to Nashville, the trial court could have

granted a continuance. However, because we believe Carruthers waived his right to be present, there was no error by the trial court in this respect.

The facts of this case can readily be distinguished from those in Muse. In Muse, beside not knowing about the change in dates, the defendant did not appear in court on the day trial commenced. Cf. State v. Robinson, No. 03C01-9512-CR-00410 (Tenn. Crim. App., July 16, 1997). In the case at hand, although the defendant may not have known about the change in time and place of the hearing, the defendant was given every opportunity to appear before the judge at the prison. This is not a case where the trial judge was going to proceed without even making an effort to secure the presence of the defendant. The defendant was housed in the same facility where the hearing took place, and the warden informed him on at least three separate occasions that the judge was going to proceed without him if he chose not to appear. Carruthers did not personally appear before the judge and waive his right to be present. However, the record before us clearly reflects that this was his intention. We believe this scenario is akin to the situation where a defendant is initially present in the courtroom and then "[v]oluntarily is absent after the trial has commenced." See Rule 43. Carruthers obviously knew the sentencing hearing was about to begin but voluntarily chose not to participate. Given the discussion above, we find that Carruthers waived his right to be present at the sentencing hearing.

**Prosecutorial Misconduct**

Both appellants claim the prosecutors made improper arguments during both phases of the trial which require a remand for a new trial.

As is commonly recognized, closing arguments are an important tool for the parties during the trial process. Consequently, the attorneys are usually given wide latitude in the scope of their arguments, see State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994), and trial judges, in turn, are accorded wide discretion in their control of those arguments, see State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Such scope and discretion, however, is not completely unfettered. Argument must be temperate, based upon the evidence introduced at trial, relevant

to the issues being tried, and not otherwise improper under the facts or law. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). The test for determining whether the prosecuting attorney committed reversible misconduct in the argument is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The following factors have been recognized to aid the Court in this determination: 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994); State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

Initially, Carruthers claims that because he was representing himself the trial court should have taken a more active role in guarding against prosecutorial misconduct during argument. As we noted earlier, there are certain perils a defendant faces when representing himself at trial. Knowing when to object during argument obviously is one of those perils. While the trial court can intervene sua sponte and take curative measures when the argument becomes blatantly improper, see, e.g., State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998), the trial court must exercise its discretion and should not exert too much control over the arguments. The judge does not serve as a pro se defendant's counselor during trial. The judge should intervene only when requested or when the judge deems proper in the interest of justice.

Carruthers refers to several instances of allegedly improper argument that occurred during the guilt phase of the trial. He claims the prosecutor improperly characterized him as a conniver and liar and accused him of manipulating the jury. Evidence was introduced that Carruthers was the mastermind behind these crimes, and therefore, any reference by the state in this regard was not improper. However, the prosecutor may not comment unfavorably upon the defendant's pro se representation of himself or the presentation of his case. See Coker v. State, 911

64

S.W.2d 357, 368 (Tenn. Crim. App. 1995). Nor should a prosecutor express his or her personal opinion about the credibility of witnesses, unless the comments are grounded upon evidence in the record. See State v. West, 767 S.W.2d 387, 394 (Tenn. 1989). Moreover, a prosecutor is strictly prohibited from commenting on the defendant's decision not to testify. Coker, 911 S.W.2d at 368. This would include his decision not to present any proof. However, a prosecutor's statement that proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify. State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991); State v. Coury, 697 S.W.2d 373, 378 (Tenn. Crim. App. 1985). The prosecutor should also refrain from calling the defendant derogatory names. State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998).

In this case, it was improper for the prosecutor to call the appellant names, such as a liar. However, we do not find improper the comments telling the jury to watch out for "pitfalls" and "mind games" and not to succumb to a "guilt trip." The prosecutor was simply making reference to the strength of the state's proof. Also, the prosecutor should not have insinuated that Carruthers was trying to manipulate the jury or comment that Carruthers did not call any credible witnesses on his behalf. Contrary to Carruthers' claim, however, we do not believe these comments improperly referred to Carruthers' failure to testify. Similarly, Carruthers complains about the prosecutor's statements that Carruthers was trying to manipulate the media. However, Alfredo Shaw testified about this. Moreover, the state is permitted to argue reasonable inferences from the evidence in the record. Coker, 911 S.W.2d at 368. The state's argument in this respect was not improper. Carruthers also claims the state's reference to the "second part" of Carruthers' master plan mentioned in the letters he wrote to Maze was improper. Since this was brought up by the evidence, we do not think this comment was improper. Carruthers also claims the prosecutor's statement to the jury that they have a responsibility to the victims' family improperly appealed to the emotions and sympathies of the jury. See State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). We agree. Finally, Carruthers contends the prosecutor's comment that there is a "gap" in the evidence was improper. Carruthers claims this was an improper inference on his failure to testify.

65

We disagree. The state's case was based on circumstantial evidence and the prosecutor's comment in this respect merely informed the jury that not all the pieces to the puzzle were presented at trial.

Both appellants complain about certain comments made by the prosecutor during argument at the penalty phase of trial. Both appellants take issue with the prosecutor's mention of the ten commandments in the Bible. Just recently, in State v. Middlebrooks, 995 S.W.2d 550, 559 (Tenn. 1999), our Supreme Court made the following comment regarding this type of argument:

> We have condemned Biblical and scriptural references in a prosecutor's closing argument so frequently that it is difficult not to conclude that the remarks in this case were made either with blatant disregard for our decisions or a level of astonishing ignorance of the state of law in this regard.

This argument by the prosecutor was obviously improper under the decisions of our Supreme Court.

Both appellants also contend that the state made improper victim impact argument. Victim impact evidence and argument during sentencing are not prohibited by the constitution or statute. See State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998). However, the argument must be relevant to the specific harm to the victim's family, Middlebrooks, 995 S.W.2d at 558, and must be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's family." Nesbit, 978 S.W.2d at 891 (footnote omitted). The "victim's family members' characterization and opinion about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id. at 888 n.8. Again, the prosecutor cannot simply appeal to the emotions and sympathies of the jury while invoking victim impact argument. Id. at 891 (citing State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994)). We agree with the appellants that the prosecutor improperly commented that the family members who testified did not cry and had remained

quiet during trial. Also improper was the comment that the families "trust in you [the jury]." The family members could have testified that they missed the victims (emotional impact of victim's death), and the comment by the prosecutor that they chose not to solicit this testimony was not improper.

Montgomery also claims that the prosecutor improperly asserted his personal opinion into closing argument. While a prosecutor may not express a personal opinion or belief, comments during argument prefaced by phrases such as "I think" or "I submit" are unlikely to be adjudged opinions. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Accordingly, we do not believe the comments Montgomery complain about which contain these phrases were improper. Montgomery asserts that the prosecutor improperly read to the jury a dictionary definition of the term "mitigate" and improperly asked the jury to use that definition to determine whether any mitigating evidence was presented. According to Montgomery, the prosecutor erroneously told the jury that mitigating evidence is that which mitigates the crime, rather than that which mitigates the punishment. Although the prosecutor may have not clearly provided the jury with the legal meaning of mitigation, the trial judge properly instructed the jury and the jury is presumed to have followed those instructions. State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998). Finally, we agree with the state that the death penalty statute does not limit the state's final closing argument to rebutting that which the defendant argued. T.C.A. § 39-13-204(d).

We find that the appellants have waived any challenge regarding the majority of the comments about which they complain because they failed to voice a contemporaneous objection. T.R.A.P. 36(a); see also State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Nonetheless, we have reviewed the entire arguments of all parties, and considering the factors listed above, we find that the relatively few improper comments by the prosecutors did not affect the verdict to the prejudice of the appellants. This issue is without merit. However, we remind counsel of the warnings recently related by our Supreme Court in State v. Middlebrooks, 995 S.W.2d 550, 561 (Tenn. 1999):

Those who interpret these cases as precedent for the view that improper closing argument and misconduct of this nature will be held harmless error in all cases do so at their own professional peril and at the risk that the misconduct, even if it does not prejudicially affect the verdict, may be deemed to be prejudicial to the judicial process as a whole and therefore require a new trial or sentencing hearing.

**Gag Order**

Next Carruthers claims the trial court erred by issuing a gag order before the start of trial. Carruthers contends the gag order, which prevented any of the attorneys or pro se litigants from making extra-judicial statements about the case, adversely affected his ability to present a defense. Specifically, Carruthers claims that the order may have prevented an important witness from coming forward.

On March 4, 1996, the trial court issued an order as follows:

> The Constitutions of the United States and the State of Tennessee guarantee defendants in all criminal cases due process of law and the right to a fair and impartial jury. It is the duty of the trial court to see that every defendant is afforded all his constitutional rights.
> In order to safeguard those rights, this Court is of the opinion that the following rule is necessary to constitutionally guarantee an orderly and fair trial by an impartial jury. Therefore, this Court orders the following:
> All lawyers participating in this case, including any defendants proceeding pro se, the assistants, staff, investigators, and employees of investigators are forbidden to take part in interviews for publicity and from making extra-judicial statements about this case from this date until such time as a verdict is returned in this case in open court.
> Because of the gravity of this case; because of the long history of concerns for the personal safety of attorneys, litigants and witnesses in this case; because of the potential danger - believed by this Court to be very real and very present - of undermining the integrity of the judicial system by "trying the case in the media" and of sullying the jury pool, this Court feels compelled to adopt this extraordinary pretrial measure. State v. Hartman, 703 S.W.2d 106 ([Tenn.] 1985), and State v. Green, 783 S.W.2d 548 ([Tenn.] 1990).

Much of the procedural history of this case has been outlined previously, including the numerous threats to attorneys and the death of one of the co-defendants. As Carruthers acknowledges in his brief, "[t]his trial was charged with emotion from start to finish. There were allegations of gang affiliations and testimony of large scale narcotics dealings. The courtroom was guarded by S.W.A.T. team members and by Sheriff's deputies who were authorized to search those entering the courtroom." Furthermore, as the trial judge stated in an in camera

hearing during the middle of trial on April 20, 1996, a deputy jailer had been gunned down in the jailer's driveway the day before and the judge expressed concerns that there might be a connection to this case. He also noted that one witness fled and could not be found after reading about this case in the newspaper. Further, the judge indicated that two witnesses who already testified stated that appellant Montgomery threatened to kill them if they talked about this case. Alfredo Shaw even testified that Carruthers tried to make arrangements to have Shaw recant his testimony in front of the media.

This case was the subject of another interlocutory appeal to this Court, wherein we held that the trial court's gag order on the media precluding them from printing the name of a witness who already testified was an unconstitutional prior restraint. State v. Montgomery, 929 S.W.2d 409 (Tenn. Crim. App. 1996). Accordingly, the media was not excluded from these proceedings and was free to report anything about the case, including the events that transpired in the courtroom. The gag order at issue here was directed at the attorneys, including the pro se litigant. The trial court properly concluded that there was no problem prohibiting the attorneys or their representatives from speaking about the case. State v. Hartman, 703 S.W.2d 106, 116 (Tenn. 1985). The twist in this case, however, is that Carruthers was representing himself during trial.

As we stated earlier, "one of the most fundamental responsibilities of a trial court in a criminal case is to assure that a fair trial is conducted." State v. Franklin, 714 S.W.2d 252, 258 (Tenn. 1986). And while prior restraints on speech are generally suspect, see, e.g., State v. Montgomery, 929 S.W.2d 409 (Tenn. Crim. App. 1996), there are instances where the exercise of free speech must yield to the most fundament of all freedoms, the right to a fair trial. See The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1512 (11th Cir. 1991). The right to a fair trial is guaranteed, not only to the accused, but also to the state as the representative of the people. See, e.g., United States v. Ford, 830 F.2d 596, 603 (6th Cir. 1987) (Krupansky, J., concurring). Carruthers cites United State v. Ford, which provides that there must exist a "clear and present danger" before a trial court may impose

a prior restraint on a criminal defendant's speech during trial. Other federal circuits, however, apply a lower standard when evaluating restrictive orders imposed upon criminal defendants; that is, whether there is a "reasonable likelihood" that a fair trial will be lost absent the restriction on speech. See The News-Journal Corp., 939 F.2d at 1515 n.18.

Regardless of which standard is applied in this case, we agree with the state that there was at least a specific clear and present danger that an unfair trial would occur if the speech of the defendant was not curtailed. Since this case garnered substantial media attention in the Memphis area, the trial judge was rightly concerned about the media's influence on the potential jury pool. The trial judge remarked about the several media interviews given by Carruthers, his investigators, as well as one of the prosecutors. Furthermore, as demonstrated through the testimony of Shaw, Carruthers apparently threatened Shaw and made arrangements through one of his investigators to have a news reporter interview Shaw about recanting his story. Obviously, if a criminal defendant is allowed to manipulate the witnesses and media during trial, the guarantee of a fair trial is nonexistent. Aside from this, as already made evident, the trial judge was also properly concerned about the safety of all involved. The order was specifically drawn to curtail the particular dangers of an unfair trial in this case. That is, the judge did not want any attorney, staff member, investigator or pro se litigant to have any exchange with the media. Given the entire record of proceedings in this case, we find no problem with the trial court's gag order. See Pedini v. Bowles, 940 F.Supp. 1020 (N.D.Tex. 1996); United States v. Hill, 893 F.Supp. 1039 (N.D.Fla. 1994). Moreover, although apparently not considered by the trial judge, we do not believe there were any reasonable alternatives to the gag order. See, e.g., The News-Journal Corp., 939 F.2d at 1513 n.16.

Carruthers' main complaint about the gag order is that he may have been prevented from discovering the presence of an otherwise unknown witness. Again, the media was given free rein to cover the proceedings at trial. The public was certainly aware of what was going on, and we do not believe an interview by

Carruthers would have produced different results than were achieved with the existent media coverage. Accordingly, even if the gag order was invalid, given the nature of Carruthers' complaint, it did not affect the fairness of the trial.

**Severance**

Montgomery claims the trial court erred in denying his motions to sever the trial of the two defendants. Specifically, he claims he was unduly prejudiced in this joint trial because certain statements by Carruthers would not have been admitted against him in a separate trial and because of the manner in which Carruthers represented himself at trial. The state contends the trial court acted properly.

The decision whether to grant a motion to sever defendants lies within the discretion of the trial judge and that decision will not be overturned on appeal unless the moving party was clearly prejudiced. State v. Hutchison, 898 S.W.2d 161, 166 (Tenn. 1994). A motion to sever may be granted before trial if "it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn.R.Crim.P. 14(c)(2)(i). A motion to sever made during trial may only be granted when the defendant to be severed consents and it is necessary to achieve a fair determination of guilt. 14(c)(2)(ii). Before a defendant is entitled to a reversal, the record must show that the "'defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty.'" State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

> "It may have been to the interest of each [defendant] that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants."

State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981) (quoting Woodruff v. State, 51 S.W.2d 843, 845 (Tenn. 1932)).

71

Montgomery contends that letters Carruthers wrote to Jimmy Maze, a statement Carruthers made to Jonathan Montgomery in Maze's presence, and the statements of Jonathan Montgomery to Chris Hines would not have been admissible against him in a separate trial because the evidence was insufficient to establish a conspiracy at the time the statements were made. We disagree. We have previously discussed the two statements by Jonathan Montgomery to Chris Hines and found that the first statement was properly admitted under the co-conspirator exception to the hearsay rule. The proof at trial clearly connected James Montgomery to Hines' car. We also believe, contrary to Montgomery's insistence, that Carruthers' letters and statements to Jimmy Maze would have properly been admitted against Montgomery under this same exception to the hearsay rule. We previously stated that the trial court properly admitted these letters into evidence against Carruthers. And while the letters do not specifically mention Montgomery, other evidence introduced at trial clearly connected Montgomery to Carruthers' plan. In fact, while Carruthers and Jonathan Montgomery were riding around with Maze in December 1993, Carruthers mentioned that they would need to wait until James was released from prison before kidnapping Anderson. And although the state must show the existence of a conspiracy in order to introduce hearsay of a co-conspirator, the trial judge may permit independent proof of a conspiracy after the admission of the hearsay evidence. State v. Hodgkinson, 778 S.W.2d 54, 61 (Tenn. Crim. App. 1989) (citing Solomon v. State, 76 S.W.2d 331 (Tenn. 1934)). However, even if the letters and statements to Maze would not have been admissible against Montgomery in a separate trial, the error was harmless in this case. State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994). The evidence was otherwise sufficient to sustain the convictions of Montgomery.

Similarly, Montgomery also insists that Charles Ray Smith could not have overheard Carruthers and Montgomery discuss the conspiracy when Marcellos Anderson returned Carruthers to prison from furlough because the prison records reflect that Carruthers did not take furlough after Montgomery was transferred to the Mark Luttrell Reception Center. However, the records do reflect that Carruthers, Montgomery and Smith were all housed at the same time in the Reception Center

during the early part of November 1993. Moreover, Andre "Baby Brother" Johnson testified that Smith warned him and Anderson to watch out for Carruthers and Montgomery. Both Johnson and Terrell Adair were also present when Montgomery and Carruthers mentioned they had someone already targeted. Also, Montgomery told Adair that if the police did not have a body, there could be no crime. This matched statements attributed to Carruthers. Accordingly, Montgomery's complaint in this respect must fail.

Montgomery further claims a severance should have been granted because the manner in which Carruthers conducted his defense prejudiced Montgomery's case. Montgomery complains about Carruthers' mannerisms in front of the jury as well as a few of the questions he asked some witnesses. He also suggests that Alfredo Shaw would not have been called to testify against him in a separate trial and the fact that Carruthers called him to testify unduly prejudiced his case because it was "some of the most damaging evidence of the entire trial."

When two defendants are on trial together, there will invariably be evidence admissible against one that would otherwise not be admissible against the other. This factor alone, however, does not preclude the state from going forward in a trial on two or more defendants. In cases where evidence would be admissible against one defendant but not the other, the trial court may properly instruct the jury that they are only to consider the evidence admissible against each defendant separately. In the present case, although certain evidence, such as Alfredo Shaw's testimony, may not have been admissible against Montgomery, the trial court in this case instructed the jury that each appellant was "entitled to have their cases decided on the evidence and the law which is applicable to them." The jury is presumed to have followed the court's instruction. State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992). However, even if the trial judge in this case should have excluded Shaw's testimony or severed the trials, given the other convicting evidence introduced, we do not believe Montgomery was unfairly prejudiced by Carruthers' questioning of Shaw. See State v. Hutchison, 898 S.W.2d 161, 166-67 (Tenn. 1994).

73

Furthermore, counsel or a pro se litigant has an obligation only to represent the interests of his or her client or him or herself. See State v. Brown, 644 S.W.2d 418, 421 (Tenn. Crim. App. 1982). Similarly, counsel or a pro se litigant has no obligation to protect the interests of a co-defendant. Id. In fact, it is permissible for one defendant to attempt to place the blame during trial on his or her codefendant. See State v. Ensley, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996). Each defendant has discretion to develop his or her own trial strategy. Having reviewed each of Montgomery's complaints regarding the manner in which Carruthers handled his case, we do not believe Carruthers' conduct violated Montgomery's rights so as to warrant a severance or a mistrial. See id. Accordingly, for the reasons stated herein, this issue is without merit.

**Testimony of Benton West and Nakeita Shaw**

Montgomery next claims that the court improperly allowed hearsay testimony by Benton West and failed to give limiting instructions regarding Nakeita Shaw's prior inconsistent statement.

At trial West testified that Nakeita Shaw told him she thought Anderson and Tucker were being kidnapped and that she hoped nothing happened to them. The first statement, that Shaw thought the victims were being kidnapped, was solicited during the prosecutor's direct examination of West. The second statement was initially solicited during Montgomery's cross examination. Both statements were hearsay, however, neither Carruthers nor counsel for Montgomery voiced an objection. Accordingly, we find that this error has been waived. T.R.A.P. 36(a); State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). Moreover, when there is no contemporaneous objection to a hearsay statement, the jury may consider it as evidence and give the testimony such weight as it deems proper. See State v. Bennett, 549 S.W.2d 949, 950 (Tenn. 1977).

Shaw testified that she moved to Milwaukee after the police investigation began because she had received a death threat. While she stated that these threats did not come from James Montgomery, she did testify that James Montgomery told

74

her that she could be charged as an accomplice in this case.  Shaw gave a statement to the Milwaukee Police wherein she said Anderson and Tucker were escorted out of her house with their hands tied behind their backs.  At trial, while reiterating that she was still afraid for her life, she testified that she did not see their hands bound in any manner.  Montgomery claims Shaw's earlier statement to the police was a prior inconsistent statement that should have only been admitted for impeachment purposes, not for the truth of the matter asserted.  No limiting instruction was requested or given.  The state argues in response that the prior statement by Shaw was admissible to help explain to the jury, in light of her testimony that she was still afraid for her life, why her trial testimony differed from her statement to the police.

Prior inconsistent statements of witnesses can only be offered to impeach a witness' credibility, not for the truth of the matter asserted.  State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982).  However, where there is no contemporaneous request for a limiting instruction, the error of the trial court cannot later be attacked on appeal. T.R.A.P. 36(a). Montgomery correctly asserts, however, that the failure by a trial court to issue a contemporaneous curative instruction for prior inconsistent statements, even in the absence of a special request, could, under some circumstances, constitute reversible error: "[when] the impeaching testimony is extremely damaging, the need for the limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused." Reece, 637 S.W.2d at 861.  In Reece, the Supreme Court also stated that the reviewing court should consider the overall strength of the state's case in deciding whether the failure to instruct constitutes reversible error. Id. Since Shaw testified on the stand that the victims' hands were not tied when they left her house, there should have been an instruction regarding her prior inconsistent statement to the police.

We do not agree with the state's argument that the prior inconsistent statement was properly admitted to explain Shaw's trial testimony.  To allow the admission of Shaw's statement to the police for the truth of the matter asserted

75

"would be to hold that hearsay evidence not under oath took precedence over evidence given by the same witness under oath and on the witness stand." Id. However, considering the nature of the statement in light of the other evidence, including the fact that the bodies were discovered with their hands bound, as well as the strength of the state's case, albeit predominantly based on circumstantial evidence, we do not believe the failure to give a contemporaneous instruction resulted in substantial prejudice to Montgomery. This claim is without merit.

**Testimony of Terrell Adair, Andre Johnson and Chris Hines**

Montgomery also claims that certain testimony by these three witnesses was erroneously allowed by the trial court. The state disagrees.

The prosecutor asked Adair if he was present during a conversation between Charles Ray Smith, Marcellos Anderson and Andre Johnson about their personal safety. Adair stated he was and then the prosecutor asked Adair what Smith said. Counsel for Montgomery objected claiming the answer called for hearsay. After a bench conference, the trial court sustained the objection but allowed the prosecutor to ask Adair if the conversation took place. The prosecutor then asked the following question: "Mr. Adair, without telling us what Mr. Smith said, was there a conversation regarding their personal safety between Charles Ray Smith and Mr. Andre Johnson and Marcellos Anderson?" Montgomery claims on appeal that this question was an improper use of a prior consistent statement.

We find that the appellant has waived this issue, however, we also disagree with the appellant's claim. Counsel objected to the question at trial because it called for hearsay. The trial court sustained the objection. Counsel, however, failed to voice an objection based on the use of a prior consistent statement. Accordingly, he waived any challenge to the alleged error. T.R.A.P. 36(a); State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). See also State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990) (a defendant "may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground for his contention in this Court"). Regardless, we do not believe this is a situation where a witness was

improperly questioned about a prior consistent statement. The witness was not testifying about a prior statement he made, rather he was testifying about a conversation that took place between three other individuals. While it may have been hearsay, we do not find any other error in the testimony in this respect.

Montgomery also complains about a portion of Andre Johnson's testimony. At one point, the prosecutor asked Johnson if he had a talk with Anderson about Carruthers and Montgomery. Johnson responded: "I had a talk to Marcellos and Terrell Adair. I told them, 'Look, do not ride James and Tony in a car with you because a friend of mine was in jail with them told them people --.'" Counsel for Montgomery immediately objected and the judge told the witness that he could not repeat what someone else said to him. The prosecutor then asked Johnson what he told Adair and Anderson, and Johnson answered: "I told them, 'Don't ride James and Tony in the car with you because they out to rob you and kill you.'" Montgomery now claims this was an improper use of a prior statement. For the same reasons we discussed above in relation to Adair's testimony, we find that the appellant has waived this claim. Nevertheless, we do not believe this constituted a prior statement. This was the first time Johnson was asked about what he told Anderson and Adair, therefore, there was no other statement, either consistent or inconsistent, before the jury.

Montgomery alleges that the court erred in allowing the prosecutor to question Chris Hines about a prior statement. The appellant claims there was no basis for this line of questioning. Hines was questioned by the prosecutor and then both appellants cross examined him. During redirect, in an attempt to rehabilitate the witness, the prosecutor questioned Hines about a statement he gave to the police. Counsel for Montgomery objected to this line of questioning stating that it went beyond the scope of cross examination. The trial judge made the following comments in overruling the objection:

> Everything he asked about, though, relates to the subject matter that has been covered in this statement. Questions were asked about the car wash, who washed it, how it was washed, who cleaned out the trunk, what the circumstances were, what the circumstances were

77

when he talked to Jonathan, what the circumstances were when he talked to James and Tony, how many phone calls were made, when they were made, how they were made. Everything that is related to in this statement that's being used on redirect was covered on cross by both of you-all. And if he gets into areas in this statement that go beyond what was covered on cross, certainly your objection would be sustained. As long as the areas in this statement that he is covering pertain to the areas that you-all covered on cross, I'm going to overrule the objection.

We agree with the trial court's ruling and find no error in this line of questioning by the state on redirect. See State v. Tizard, 897 S.W.2d 732, 746 (Tenn. Crim. App. 1994); State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). This claim, therefore, is also without merit.

**Opinion Testimony**

Montgomery claims that Chris Hines should not have been allowed to give his opinion of what Montgomery meant when he told Hines that a rifle had blood on it. Montgomery cites Tenn. R. Evid. 701, which provides that a lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based upon the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." He argues that Hines' interpretation had no foundation of fact and was not rationally based on his perception. In response, the state contends that Hines was not being asked to give his opinion as to what Montgomery meant, but to explain why Hines refused to accept the weapon.

At the trial, the state asked Hines what having blood on the weapon meant to him, and he responded that it meant that somebody had been shot with it. At this point, Montgomery objected "as far as what it meant to" Hines, but the trial court overruled the objection.

To the extent that the testimony was presented to show Hines' interpretation for the purpose of explaining Hines' rejection of the weapon, we believe the evidence was inadmissible because it was wholly irrelevant to the issues on trial. See Tenn. R. Evid. 401, 402. To the extent that the testimony could be taken as evidence of what Montgomery meant by saying that the weapon "had blood on it," we believe

78

that the record provides insufficient foundation to justify the admission of Hines' interpretation. If a phrase is not common parlance and carries a particular meaning in a particular context or environment, the witness to such meaning should lay a foundation that shows that the witness has the specialized knowledge needed to assist the jury substantially to understand the evidence. Tenn. R. Evid. 702. Such was not done in this case.

However, we conclude that any error was harmless. We do not believe that the jury was at undue risk because of Hines' opinion, given the fact that they already knew that Montgomery said that the weapon had blood on it. Such is also true in the context of all of the remaining evidence in this case. The defendant does not specify any particular prejudice that more probably than not affected the verdict and we find none in our review of the record.

**Jury Instructions**

Montgomery claims the trial court's jury instruction on the especially heinous, atrocious or cruel aggravating circumstance was improper. He claims that the use of the phrase "in that" instead of "and" - the murder is especially heinous, atrocious or cruel in that it involved torture or serious physical abuse - suggested to the jury that all acts of torture or serious physical abuse are automatically classified as heinous, atrocious or cruel. This very argument has recently been rejected by our Supreme Court. See State v. Nesbit, 978 S.W.2d 872, 887 (Tenn. 1998). Accordingly, this claim must fail.

Montgomery also claims that the trial court improperly instructed the jury regarding mitigating evidence. Specifically, he claims the trial court erred by instructing the jury that it should not distinguish between statutory and any requested non-statutory mitigating circumstances and by instructing the jury on statutory mitigating circumstances that were not supported by the record. The trial judge instructed the jury on mitigating evidence according to the statute in existence at the time. T.C.A. § 39-13-203(e) (1991). The appellant seems to suggest that the "no distinction" aspect of the instruction prejudiced him because he did not request an

instruction on any non-statutory circumstance. However, since there were no non-statutory circumstances requested, the jury did not have anything to distinguish. Accordingly, we do not believe the appellant was prejudiced by this instruction.

Montgomery further claims that the judge erred in instructing the jury on all of the statutory mitigating circumstances even though they were not all supported by the record. According to the appellant's argument, this undermined his actual mitigation and emphasized to the jury the number of circumstances missing from the case. The Supreme Court has recognized that only those mitigating circumstances raised by the evidence should be instructed. See State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1993). The Court has also held, however, that any such error in this respect does not require reversal unless the appellant can show prejudice. Id. The appellant claims, despite the Supreme Court's ruling on this issue, that instructing on all of the circumstances does not benefit him. Again, absent a showing of prejudice, this claim must fail. See State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998) (adopting the portion of this Court's opinion addressing this issue). The appellant has failed to show how he was prejudiced by the instruction. Accordingly, this issue is without merit.

**Sufficiency of the Evidence**

Both appellants challenge the sufficiency of the convicting evidence. A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, "the state is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This Court does not reweigh or reevaluate the evidence. Id. The jury's verdict, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); T.R.A.P. 13(e).

A criminal offense may be proven through direct evidence, circumstantial evidence, or a combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). See also State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992)("the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before the defendant may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 613.

At the time of this offense, first degree murder was defined as "an intentional, premeditated and deliberate killing of another." T.C.A. § 39-13-202(a)(1) (1991) (the current first degree murder statute does not require proof of deliberation). Once a homicide has been proven, it is presumed to be a second-degree murder and the state has the burden of establishing premeditation and deliberation. State v. Brown, 836 S.W.2d 530 (Tenn. 1992). Intentional is defined as "the conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(a)(18)(1991). Premeditation necessitates "the exercise of reflection and judgment," T.C.A. § 39-13-201(d) (1991), requiring "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Whereas deliberation is defined as a "cool purpose," "without passion or provocation." § 39-13-201(b)(1) and comments (1991).

The elements of premeditation and deliberation are questions for the jury and may be inferred from the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). The Supreme Court has delineated several relevant circumstances which may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill, and the making

of preparations before the killing for the purpose of concealing the crime. Id. This Court has also noted several factors from which the jury may infer these elements: facts about what the appellant did prior to the killing which would show planning; facts about the appellant's prior relationship with the victim from which motive may be inferred; and facts about the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App.), perm. to app. denied, (Tenn. 1995) (citing 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law § 7.7 (1986)).

At the time of the crimes, especially aggravated robbery was defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403 (1991). Especially aggravated kidnapping was the knowing removal of confinement of another unlawfully so as to interfere substantially with the other's liberty, accomplished with a deadly weapon or where the victim suffers serious bodily injury. T.C.A. § 39-13-305 (1991).

The trial evidence is thoroughly outlined above. Having reviewed the proof in the record in the light most favorable to the state, we find that a rational jury could reasonably have found the appellants guilty of all charges. Again, convictions may be based solely on circumstantial evidence and all questions regarding credibility of witnesses are resolved by the jury. This issue is without merit. Furthermore, while not addressed by either appellant, we have examined the evidence and have found that the proof was sufficient to support the aggravating circumstances found by the jury and that the aggravating circumstances outweigh the mitigating evidence beyond a reasonable doubt. T.C.A. § 39-13-206(c)(B)-(C) (1991).

**Death Penalty Statute**

Both appellants challenge the constitutionality of Tennessee's death penalty statute. All of the numerous claims raised by the appellants have repeatedly been denied by our Supreme Court. See, e.g., State v. Burns, 979 S.W.2d 276 (Tenn. 1998) (adopting this Court's review of this issue); State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 74 (Tenn. 1994). Accordingly, these

claims must fail. Carruthers also claims that the recent amendment to T.C.A. § 40-23-114 (1998 Supp.), which allows those capital case defendants who committed their offense prior to January 1, 1999, to elect to be put to death by lethal injection constitutes an unconstitutional delegation of legislative authority. We disagree. The statute clearly states that this class of offenders shall be put to death by electrocution. The statute, however, gives the offender the option to waive this method of execution and elect lethal injection instead. This is not a delegation of the legislature's authority. This claim is without merit. At any rate, this statute does not affect the appellants' convictions or sentences.

**Proportionality Review**

Pursuant to T.C.A. § 39-13-206, this Court must consider whether the sentence of death was imposed in an arbitrary fashion and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. Interestingly, neither appellant has addressed the proportionality review in their appellate briefs. The Supreme Court recently issued the following mandate in order to assist the appellate courts in fulfilling their statutory duties:

> the State and the defendant in each case <u>must fully brief the issue</u> by specifically identifying those similar cases relevant to the comparative proportionality inquiry. When addressing proportionality review, <u>the briefs of the parties shall contain</u> a section setting forth the nature and circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted, including the statutory aggravating circumstances found by the jury and the evidence of mitigating circumstances. In addition, <u>the parties shall include</u> in the section a discussion of the character and record of the defendants involved in the crimes, to the extent ascertainable from the Rule 12 reports, appellate court decisions, or records of the trial and sentencing hearings in those cases.

State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997) (emphasis added) (internal footnotes omitted). The <u>Bland</u> opinion was issued well before the appellate record was filed in this case.

In <u>Bland</u>, the Supreme Court outlined the process appellate courts should employ when conducting a comparative proportionality review. The review required is not a rigid, objective test, <u>id.</u> at 668, nor are the courts bound to consider only those cases in which exactly the same aggravating circumstances have been found,

State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). It is the duty of the appellate court, not to "assure that a sentence less than death was never imposed in a case with similar characteristics," but to "assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665. With respect to the circumstances of the offense, we consider: 1) the means of death; 2) the manner of death; 3) the motivation for the killing; 4) the place of death; 5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; 6) the absence or presence of premeditation; 7) the absence or presence of provocation; 8) the absence or presence of justification; and 9) the injury to and effects on nondecedent victims. With respect to comparing the character of the defendants, the following factors are relevant: 1) the defendant's prior criminal record or prior criminal activity; 2) the defendant's age, race, and gender; 3) the defendant's mental, emotional or physical condition; 4) the defendant's involvement or role in the murder; 5) the defendant's cooperation with authorities; 6) the defendant's remorse; 7) the defendant's knowledge of helplessness of victim(s); and 8) the defendant's capacity for rehabilitation.

The facts and circumstances of the offenses in this case have been thoroughly detailed above. The three victims were kidnapped and ultimately buried alive. Before being placed in the ground, two of the victims were shot and one was beaten with a shovel. The appellants knew their victims: Marcellos Anderson, twenty-five years of age; his mother, Delois Anderson, in her forties; and Frederick Tucker, seventeen years old. The appellants were both twenty-six years of age at the time of the murders. Both appellants claim they are innocent of the crimes. As the presentence reports indicate, both appellants have extensive prior criminal records, including crimes of violence to the person.

While no two cases are the same, the following cases where the death sentence was imposed contain similar characteristics to the present one: In State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985), the twenty-eight year old defendant shot and slit the throats of the two victims and left them to die in the woods during an

allegedly botched drug deal. The jury found two aggravating circumstances: the murder was especially heinous, atrocious or cruel and the murder was committed during the course of a robbery. In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the forty year old defendant was convicted on three counts of the premeditated murders of his estranged wife and her two sons. The victims were shot and stabbed in their home. There was also evidence that the defendant had previously threatened the victims. The defendant presented an alibi defense at trial. The jury found four aggravating circumstances for two of the victims (the murder was especially heinous, atrocious or cruel; the murder was committed for the purpose of avoiding arrest or prosecution; the murder was committed during the commission of a felony; the defendant committed mass murder) and two for the third victim (the murder was especially heinous, atrocious or cruel and the defendant committed mass murder). In State v. Burns, 979 S.W.2d 276 (Tenn. 1998), the young defendant was convicted of felony murder and sentenced to death. The defendant and his accomplices approached four young men sitting in a car, robbed them, and killed two of them. The jury found one aggravator, that the defendant created a risk of harm to two or more persons. In State v. Morris, No. 02C01-9801-CC-00012 (Tenn. Crim. App., Feb. 5, 1999) (appeal to Supreme Court pending), the thirty-eight year old defendant was convicted on two counts of premeditated first degree murder and sentenced to death. The defendant intended to rob his neighbors for drug money. The two victims were the male neighbor and his minor cousin-in-law. The defendant also kidnapped and raped the wife of the male victim. The jury found two aggravating circumstances: the murder was especially heinous, atrocious or cruel and the murder was committed during the course of a first degree murder, rape, burglary or kidnapping. We are convinced that the result in the case before us was neither disproportionate nor arbitrary.

## CONCLUSION

Accordingly, for the reasons stated above, we affirm the appellants' convictions and sentences. Because this case will automatically be reviewed by the Supreme Court, we will not set a date of execution. See T.C.A. § 39-13-206(a)(1).

_____
THOMAS T. WOODALL, Judge

CONCUR:


_____
GARY R. WADE, Presiding Judge


_____
JOSEPH M. TIPTON, Judge